# IN THE SUPREME COURT OF TEXAS

═══════════

No. 16-0125

═══════════

DEBRA C. GUNN, M.D., OBSTETRICAL AND GYNECOLOGICAL ASSOCIATES, P.A., AND OBSTETRICAL AND GYNECOLOGICAL ASSOCIATES P.L.L.C., PETITIONERS,

v.

ANDRE MCCOY, AS PERMANENT GUARDIAN OF SHANNON MILES MCCOY, AN INCAPACITATED PERSON, RESPONDENT

═══════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

═══════════════════════════════

JUSTICE JOHNSON, joined by JUSTICE BOYD, dissenting.

I disagree that the trial court's error in excluding the defendants' expert witness testimony regarding Shannon McCoy's future medical care expenses was harmless.

I also disagree that affidavits by subrogation agents with no disclosed familiarity or connection with the medical treatment in question provide sufficient basis to either admit the summaries of medical expenses attached to them, or support jury findings as to the reasonable and necessary amounts for past medical expenses.

Further, even if the subrogation agents' affidavits would have otherwise provided a sufficient basis to admit the attached documents and support jury findings as to medical expenses, I disagree that all of the affidavits support the jury findings as to past medical expenses. One of the affidavits

referencing over $300,000 of expenses was not sufficient because it did not address whether the expenses in the attached exhibits were necessary.

## I.  Future Medical Expenses

At trial, the parties did not dispute that Shannon's conditions would require medical care for the rest of her life.  But they disputed both whether all her conditions were proximately caused by the allegedly negligent actions of the defendants, Obstetrical and Gynecological Associates, P.A. (OGA) and Dr. Debra Gunn, as well as the cost of future care that would be medically necessary as a result of those actions.  Shannon's husband, Andre McCoy (McCoy), suing individually and as Shannon's guardian, offered, and the trial court admitted, opinion testimony of Dr. Alex Willingham regarding the probable costs of Shannon's future care.  The life-care plan he prepared was introduced in connection with his testimony.  To controvert Dr. Willingham's testimony, OGA and Dr. Gunn sought to introduce video deposition testimony from Dr. Hellen Schilling.  I agree with the Court that the exclusion of Dr. Schilling's testimony was error. *Ante* at ___.  However, I disagree that the error was harmless.

The standard for reversal of a judgment based on the exclusion of evidence is whether the error "probably caused the rendition of an improper judgment."  TEX. R. APP. P. 61.1; *see Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989).  We have explained that "[i]t is not necessary for the complaining party to prove that 'but for' the exclusion of evidence, a different judgment would necessarily have resulted." *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) (quoting *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex. 1992)).  Rather, we have explicated a framework for distinguishing between a harmless exclusion of evidence, one that

2

did not probably cause rendition of an improper judgment, and a harmful exclusion, one that probably *did* cause rendition of an improper judgment. *See id.* If erroneously excluded evidence was "crucial to a key issue," then the error was likely harmful; that is, it probably caused the rendition of an improper judgment. *Id.*; *see also Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 551 (Tex. 2018) ("[E]xclusion is likely harmful if the evidence is crucial to a key issue."); *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 145 (Tex. 2016); *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 165 (Tex. 2015); *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008). On the other hand, that does not end the inquiry. Because even if the excluded evidence was crucial to a key issue, "the exclusion . . . is likely harmless if the evidence was cumulative, or the rest of the evidence was so one-sided that the error likely made no difference in the judgment." *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870 (citing *Reliance Steel & Aluminum Co.*, 267 S.W.3d at 873).

Given the extent to which parties engage in discovery in cases such as this, there is very little, if any, evidence presented at trial that the parties' lawyers are unaware of before trial. Yet cases are tried because there is no way of accurately predicting how the evidence, or any particular piece of evidence, will affect a jury. Likewise, there is no realistic way of accurately determining how excluded evidence would have affected the jury's findings if it had been admitted. Thus, the conclusion that an error in excluding evidence relevant to a key issue "likely was harmful" is as close as any analysis is going to get. Stated another way, the test this Court has articulated is, in substance, that an error in excluding testimony is considered to have caused rendition of an improper judgment (the exclusion was likely harmful) if the excluded testimony was crucial to a key issue,

3

*provided* that the excluded evidence was not merely cumulative and that the other evidence was not so one-sided that the excluded evidence likely would have made no difference. That is a reasonable and at least somewhat objective test that requires examination of the entire record. Because OGA and Dr. Gunn are the parties asserting error, the burden is on them to meet the test. Which, as explained below, in my view they did by demonstrating that the record shows: (1) the excluded evidence was crucial to what even McCoy's attorney told the jury was the most important issue; (2) the excluded evidence conflicted with the testimony of Dr. Willingham as to the amount of treatment and care that would be necessary for Shannon in the future, thus Dr. Schilling's testimony was not merely cumulative in regard to the key issue of the cost of necessary future medical care; and (3) the opinion testimony of Dr. Willingham was not so one-sided that Dr. Schilling's testimony likely would have had no effect at all on the jury's finding for future medical expenses. After all, Dr. Willingham's testimony was opinion testimony predicting the future, not factual testimony relating past events; Dr. Schilling and Dr. Willingham had substantively equivalent credentials; each examined Shannon one time for approximately the same amount of time; and each had extensive experience in preparing life-care plans for predicting the necessity of and costs for future care for severely impaired patients.

The Court subtly but importantly departs from the workable legal standard we have established, as is set out above, for determining whether the exclusion of evidence on a crucial issue was harmful. The Court opts for merely balancing the evidence admitted and excluded to determine whether, in its opinion the excluded evidence would have made a difference in the sitting jurors' minds and findings. The Court says,

4

We have, however, noted that the role excluded evidence plays in the context of trial is important, and we have provided guidelines to assist trial courts in applying the harmful error standard. Exclusion is likely harmless if the evidence was cumulative or if the rest of the evidence was so one-sided that the error likely made no difference in the judgment. By contrast, exclusion of the evidence is likely harmful if it was "crucial to a key issue." We do not dispute that future medical expenses, which made up almost 70% of the trial court's judgment, was indeed a "key issue." But that does not end the inquiry; our guidelines make clear that the exclusion of such evidence is "*likely* harmful," not conclusively or per se harmful.

*Ante* at ___ (citations omitted). The Court then, however, proceeds to briefly analyze the evidence

and set out the standard it uses to make its decision:

An error in excluding evidence is harmful when it "probably" caused the rendition of an improper judgment, and "probably" is a higher standard than "might" or "could have." *See Caffe Ribs, Inc.*, 487 S.W.3d at 144–45 (stating that a trial court's exclusion of evidence "is reversible only if it probably caused the rendition of an improper judgment"); *Aultman v. Dall. Ry. & Terminal Co.*, 260 S.W.2d 596, 600 (Tex. 1953) (defining "probably" as "having more evidence for than against, supported by evidence which inclines the mind to believe, but leaves some room for doubt, likely") . . . But "likely" does not mean "definitively"—*we must review the record to determine whether, in this particular case, the exclusion of Dr. Schilling's video deposition testimony "probably," as opposed to "might have" or "could have," caused the rendition of an improper judgment.*

*Ante* at ___ (emphasis added). The Court's application of the standard ignores the fact that the effect

of particular evidence on a particular jury—whether admitted or excluded—is just not reasonably

predictable to a fine degree. And the questions of whether the excluded evidence was cumulative

and whether it was so one-sided that the error likely made no difference as part of the analysis

disappear for all practical purposes in the Court's analysis. But they should be the standards for

evaluating the effect of the error after it has been determined that the error was likely harmful

because the excluded evidence was crucial to a key issue. In situations such as this where the

evidence was crucial to a key issue and was not cumulative, the harm analysis should turn on

5

whether the evidence was *so* one-sided that the excluded evidence likely made no difference. The "likely" is tethered to the "so one-sided" part of the standard. Not so in the standard the Court applies today. And while the standard of "so one-sided" is to a degree subjective, it is not nearly so subjective as determining whether excluded evidence would "more likely than not" have caused the jury to return a different verdict, which in effect is merely a second-guessing of the jury's view of the evidence.

The Court's harm analysis in this case demonstrates the difference. After determining that the exclusion of Dr. Schilling's testimony was likely harmful because of its relationship to the key issue of future medical expenses, the Court moves directly to balancing the evidence. That necessarily means it considered how the jurors' thought processes likely would have worked and what the jury likely would have done had it heard the excluded evidence. Explaining a framework for that exercise is hard to do, as witnessed by the Court's explanation-less conclusion:

> Having reviewed the entire record, we cannot say that the erroneous exclusion of Dr. Schilling's video deposition testimony probably caused the rendition of an improper judgment.

*Ante* at __.

The Court also says that there's no bright line for deciding the harm question. I agree. But there must be some articulable standard which differs from merely balancing the evidence admitted and excluded. The standard we have previously articulated, properly applied, is such a standard.

Measuring the effect of the exclusion of Dr. Schilling's testimony once future medical was determined to be a key issue under the previously articulated standard—the exclusion was likely harmless if the excluded evidence was cumulative or the rest of the evidence was so one-sided that

6

the error likely made no difference in the judgment, *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870—it seems to me that, indeed, (1) the trial court erred by excluding Dr. Schilling's testimony; (2) her testimony was crucial to a key issue; (3) the testimony was not merely cumulative; and (4) the other evidence was not so one-sided that her testimony likely would have made no difference. Thus, the exclusion was not harmless.

Giving context to evidence determinative of whether the evidence was so one-sided that Dr. Schilling's testimony likely would have made no difference requires examining all the relevant evidence, beginning with whether the testimony of Dr. Schilling concerned a key issue. The starting point for analyzing that question is the judgment. *Reliance Steel & Aluminum Co.*, 267 S.W.3d at 871.

First, that Shannon's future medical care expenses were a key issue is clear from the fact that of the jury's damage findings for over $10.6 million, over $7.2 million was for future medical care. The amount found for future medical care was more than double the nearly $3.4 million for other damage findings combined. Second, whether the future medical was a key issue was answered by McCoy's attorney in his closing summation to the jury. He stated that the last blank, where the jury was to place its finding as to Shannon's future medical care expenses, "is the most important blank."

The court of appeals opined that the key dispute was liability, not damages. 489 S.W.3d 75, 112 (Tex. App.—Houston [14th Dist.] 2016). Unquestionably, the defendants consistently contested liability throughout the trial and in the court of appeals. They still do in this Court. But they also have consistently contested the amount of damages. We have never said that there is or can be only one key dispute in a trial. Nor does such a concept make sense. Many, if not the great majority of,

7

cases involve heated contests over both liability and damages. Although it hardly needs to be said that there usually are multiple key issues in a trial, we specifically acknowledged that there are in *Central Expressway*, where we said that evidence either admitted in error or excluded in error was likely harmful if the evidence "was crucial to *a* key issue." 302 S.W.3d at 870 (emphasis added); *see also Diamond Offshore Servs. Ltd.*, 542 S.W.3d at 551 (stating exclusion is likely harmful if the evidence "is crucial to *a* key issue") (emphasis added); *Caffe Ribs, Inc.*, 487 S.W.3d at 145 (same); *JLG Trucking, LLC*, 466 S.W.3d at 165 (same).

Next, the harm analysis looks to whether Dr. Schilling's testimony was crucial to the key issue of future medical expenses for Shannon. And the answer is "Yes."

Lay jurors are deemed to lack the knowledge to determine the reasonable costs of medical care that was necessary in the past or will probably be necessary in the future. *See Watkins v. Watkins*, 2000 WL 1862686, at *4 (Tex. App.—Austin 2000, pet. denied) (stating that a party cannot recover medical expenses without proof of what costs are reasonable and necessary (citing *Dall. Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 382–83 (Tex. 1956))). Thus, jurors must be guided by expert testimony in making their findings. *See id.* And almost categorically, both plaintiffs and defendants present—or at least try to present—experts to opine on the necessity of particular items of medical care and the cost of those items in the future, even when it is uncontested that future care will be necessary. And when experts testify, one aspect of persuading the jury to the presenting party's position is presenting the expert's qualifications. That is because it is generally accepted among experienced trial lawyers that (1) part of the jury's decision regarding expert testimony will

8

turn on whose expert the jury believes is the more credible witness, and (2) a significant part of an expert's credibility relates to the expert's qualifications and experience as to the particular issue.

As the Court notes, whether sufficient evidence supports the jury's finding as to expenses for future medical care is not at issue. *Ante* at ___. Dr. Willingham's testimony is evidence to support the finding. But where Dr. Schilling was the defendants' only witness as to the question of future medical care expenses, her testimony was crucial to the question of the differences between her opinions and those of Dr. Willingham. That conclusion is buttressed by McCoy's attempts to keep Dr. Schilling's testimony out of evidence. Further, Dr. Schilling's testimony was not cumulative of Dr. Willinghams's testimony as to many items of projected care and their cost, as demonstrated by both her testimony and her marked-up copy of Dr. Willingham's life-care plan for Shannon. If it had been, McCoy would not have strived so hard to keep it out, and OGA and Dr. Gunn to have it admitted. Further, neither the trial court, the court of appeals, nor this Court have concluded that it was cumulative.

Which brings us to the question of whether the evidence was "so one-sided" that Dr. Schilling's testimony likely would have made "no difference in the judgment." *See Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. The "so one-sided" question necessarily includes considering both Dr. Willingham's testimony and the evidence and testimony which would have been introduced through Dr. Schilling. If it were otherwise, then the testimony of almost every expert would be so one-sided that excluding opposing expert opinions would be harmless error.

Dr. Willingham testified extensively about his training, experience in treating patients, experience in teaching medical students, lectures he had given, and other matters to bolster the

opinions he testified to. However, Dr. Schilling's testimony showed that she was eminently qualified to opine as to and calculate the expenses likely to be necessary for Shannon's future medical care. Dr. Schilling testified that she was the medical director of the rehabilitation department at a Houston hospital; taught fourth-year residents in that area of medicine; was on the faculty at Baylor College of Medicine; reviewed complaints against physicians in the area of physical medicine and rehabilitation for the Texas State Board of Medicine, as well as Medicare and the Texas Workers' Compensation Commission; and performed peer reviews regarding other practitioners in the field of physical medicine and rehabilitation. But because the trial court excluded Dr. Schilling's testimony, the jury never heard about her training, extensive experience, and expertise.

Further, the jury heard Dr. Willingham testify about his personal examination of Shannon during the course of formulating his opinions. He described her conditions based on his personal observations as well as the medical records he reviewed. He described the records he reviewed in some detail and explained the amount of time he spent in reviewing them and analyzing them as part of reaching his opinions, in preparing his life-care plan for Shannon, and in estimating the costs of her future care. But the jury did not hear of Dr. Schilling's similar foundation for her testimony: her personal examination of Shannon, her detailed review of Shannon's records, the amount of time she spent in analyzing Shannon's probable future medical needs, her experience in caring for persons, such as Shannon, with severely debilitating conditions and her experience in preparing life-care plans.

So why would the jury give similar weight—or even any weight—to Dr. Schilling's views that were briefly referenced and depreciated by Dr. Willingham when Dr. Schilling's qualifications and other testimony were not admitted?  The answer, logically, is that it would not.  Even more, the fact that the jury knew the defendants hired Dr. Schilling to examine Shannon and review the life-care plan prepared by Dr. Willingham could well have led it to conclude that because Dr. Schilling's testimony was not presented, Dr. Willingham's testimony was not only uncontroverted, but that it was essentially uncontrovertible.  Under the circumstances, it is hard to conceive of a jury giving much, if any, credence to the limited part of Dr. Schilling's testimony that it heard via the route of hearsay through Dr. Willingham.

Dr. Willingham gave his opinions as to a range of future medical care expenses, including projections of approximately $6.9 million for a home care option and $7.24 million for a facility-based care option.  But through the filter of McCoy's retained expert, Dr. Willingham, the jury received a limited view of Dr. Schilling's opinions regarding Shannon's future medical care expenses.  Dr. Willingham  noted that Dr. Schilling projected $3.3 million as being necessary for home care and $6.7 million for facility-based care.  He referenced a copy of a life-care plan he had prepared and that had been marked up by Dr. Schilling, and testified as to his disagreement with her opinions.  After noting her projections for care, he opined that Dr. Schilling's view was, in effect, to divide the amount needed for Shannon's care in half.  Thus, the jury heard in very cursory manner of Dr. Schilling's opinions.

The jury found $7,242,403 for future medical care—precisely the amount testified to by Dr. Willingham.  That is not surprising, given that the jury heard only Dr. Willingham's testimony

11

regarding such care. Dr. Schilling's excluded testimony, in part, would have been that approximately $3.3 million, or 46% of the amount the jury found for future care, would have been reasonable for a home care situation. Her testimony as to the probable cost of future care in a facility setting was over $500,000 less than the amount Dr. Willingham testified to. While $500,000 is less than 10% of the amount that the jury found for future care, and is much less than the $3.9 million difference between Dr. Schilling's home care projection and the jury's finding, $500,000 is nevertheless a significant amount.

The Court notes, as did the court of appeals, that the full range of future medical care expense projections were in front of the jury via the opinion testimony of Dr. Willingham. *Ante* at ___. But allowing a witness hired by one party to relate to the jury a filtered version of the opinion testimony of the only witness for an opposing party as to a crucial matter, then having relevant, direct testimony of the opposing party's witness as to that matter excluded and calling it a reasonably fair trial goes too far. The trial court's ruling placed the attorneys for OGA and Dr. Gunn in a no-win situation. If they did not cross examine Dr. Willingham and challenge his testimony, the jury would most likely perceive his testimony as unchallengeable. If they cross examined him extensively about Dr. Schilling's testimony, as an experienced expert witness he simply was going to repeat his opinions and disagreement with her, thus reinforcing the effect of his testimony on the jury.

If the exclusion of testimony by witnesses for opposing parties as happened here becomes the paradigm, then a minimally competent lawyer for the plaintiff—or whichever party presents evidence first—in most cases should be able to short-circuit the opposing party's presenting much

12

evidence at all, merely by having the first, friendly witnesses testify to their version of what the opposing party and the opposing witnesses have testified to or disclosed in discovery. And it is almost guaranteed that one party's evidence presented and filtered through witnesses for the opposing party will be less adverse to the opposing party than if it were fully presented through the proponent's witnesses themselves.

In sum, I agree with the Court that the trial court erred by excluding the testimony of Dr. Schilling. But given the differences between her excluded testimony and that of Dr. Willingham regarding the key issue of the cost for future medical care for Shannon, both percentage-wise and in absolute numbers, I would hold that the excluded evidence was crucial to that key issue and the exclusion was harmful. *See Diamond Offshore Servs. Ltd.*, 542 S.W.3d at 552; *see also Caffe Ribs, Inc.*, 487 S.W.3d at 145; *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. Accordingly, I would reverse as to the future medical care damages.

## II. Past Medical Expenses

The amounts recoverable in a tort action for medical care expenses must be both reasonable in price and necessary for treatment. *See* TEX. CIV. PRAC. & REM. CODE § 18.001(b); *see also Haygood v. De Escabedo*, 356 S.W.3d 390, 399 (Tex. 2011). Such expenses may be proved by affidavit. *Id.* As relevant to the question before the Court regarding Shannon's past medical expenses, Texas Civil Practice and Remedies Code section 18.001 provides as follows:

> (b)     Unless a controverting affidavit is served as provided by this section, an affidavit that the amount a person charged for a service was reasonable at the time and place that the service was provided and that the service was necessary is sufficient evidence to support a finding of fact by judge or jury that the amount charged was reasonable or that the service was necessary.

13

(c)     The affidavit must:

. . .

(2) be made by:

(A) the person who provided the service; or

(B) the person in charge of records showing the service provided and charge made; and

(3) include an itemized statement of the service and charge.

TEX. CIV. PRAC. & REM. CODE § 18.001(b), (c)(2)–(3).

The amounts actually paid by insurance companies, with their access to large quantities of data across many health care providers, may represent what are reasonable fees for health care services, as the Court says. *Ante* at ___ (citing *Haygood*, 356 S.W.3d at 394 (stating that agreements between willing providers and willing insurers can yield reasonable rates)). However, whether fees paid for health care services rendered to a patient are reasonable is a much different question than the question of whether those health care services were medically *necessary* for the treatment of conditions caused by a particular person, event, or series of events.

OGA and Dr. Gunn objected to admission of summaries of charges and payments for Shannon's past medical care based on affidavits from representatives of three subrogation collection companies. The summaries contained information in different formats, but as relevant to the issue before us, they generally set out names of the billing providers, very brief general descriptions of services rendered by the providers, the amounts charged for the services, and the amounts paid for the services. For example, one company's summary had columns entitled "DOS Start," "DOS End," "Provider," "Service," "Diagnostic Code," "Billed," and "Paid" for each item. An example of the entries is one that listed "DOS Start" as "3/24/06"; "DOS End" as the same date of "3/24/06"; "Provider" as "The Methodist Hospital"; "Service" as "D040"; "Diagnosis Code" as "7993";

14

"Billed" as "71,440.50"; and "Paid" as "20,808.60". That is it—no other information, explanation, or detail as to the services provided or cost breakdown for the services. Every DOS Start and DOS End date on the summary for a particular service are the same date, just as the above example shows for $71,440.50 of hospital services billed.

OGA and Dr. Gunn point to the language of section 18.001 and argue that the subrogation agents who executed the affidavits are not within the pool of persons whose affidavits are sufficient to support admission of, and judgment based on, past medical expenses. They also argue that the documents attached to the affidavits do not meet the requirements of section 18.001. The Court disagrees. *Ante* at ___. I do not. I cannot agree with the Court's conclusion that by enacting section 18.001, the Legislature intended to authorize affidavits by subrogation agents located in Kentucky, Wisconsin, and Illinois to support a finding that particular treatments by health care providers in Texas were medically necessary where there is no evidence demonstrating that the affiants had any training in medicine or even had a connection with medical services, apart from their positions in companies whose business was receiving bills and information from insurance carriers and then asserting the insurers' rights of subrogation.

### A. The Subrogation Agents as Affiants

McCoy used affidavits by three subrogation agents to support the claim of $703,985.98 for Shannon's past medical expenses. One affidavit was executed in Oldham County, Kentucky, by Carroll C. Rawlings. According to the affidavit, Rawlings was the Subrogation Team Manager for the Rawlings Company, whose principal place of business was on Eden Parkway in LaGrange, Kentucky. She averred that the itemized statement of claims attached to her affidavit related to

15

Shannon's care from September 14, 2004, to December 28, 2005; the claims were paid by Aetna; and the "information contained in the records was transmitted to [her] in the regular course of business by an employee or representative of the Rawlings Company who had personal knowledge of the information." The specific language of her affidavit, in relevant part, was as follows:

> Attached to this affidavit are records that provide an *itemized statement* of the claims paid by Aetna related to the medical care provided to Shannon McCoy from September 14, 2004 to December 28, 2005 . . . . The attached *billing records* are kept by me in the regular course of business. The information contained in the records was transmitted to me in the regular course of business by an employee or representative of *The Rawlings Company* who had personal knowledge of the information. The records were made at or near the time or reasonably soon after the time that the service was provided. . . . I am familiar with the customary charges for like or similar services rendered *in this vicinity* and I know that the charges reflected on these records are reasonable for like or similar services rendered *in this vicinity*. . . . The services provided were necessary and the amount charged and paid for the services were reasonable *at the time and place the services were provided*.

(Emphasis added).

The second affidavit was executed in Waukesha County, Wisconsin, by Christi-Jo Buchanan, a Subrogation Specialist II for Meridian Resource Company, L.L.C., whose principal place of business was 20725 Watertown Road, Waukesha, Wisconsin. Buchanan's affidavit was essentially the same as Rawlings's affidavit except she averred that the claims itemized in the records attached to her affidavit covered Shannon's care from September 14, 2004, to December 23, 2007; they were paid by Unicare; and the information in the records was transmitted to her in the regular course of business by an "employee or representative of Meridian Resource Company, L.L.C. who had personal knowledge of the information."

16

The third affidavit was executed in Cook County, Illinois, by Patricia A. Heeney, the general counsel for Vengroff, Williams and Associates, Inc., whose principal place of business was 7101 North Cicero Avenue, Lincolnwood, Illinois. Heeney's affidavit was similar in substance to those of Rawlings and Buchanan. She averred that the claims itemized in records attached to her affidavit covered Shannon's care from March 6, 2006, to March 23, 2011; they were paid by the Federal Express Benefit Plan through its claims administrators, Cigna and Anthem Blue Cross Blue Shield; and "information contained in the records was transmitted to [her] in the regular course of business by an employee or representative of the claims administrators, Cigna Healthcare and Anthem Blue Cross Blue Shield who had personal knowledge of the information." But Heeney did not state in her affidavit that the services provided to Shannon were necessary; she stated only that "[t]he amount charged and paid for the services were reasonable at the time and place that the services were provided."

The contents of the affidavits and their attachments, simply put, do not make sense as to their purpose of proving the reasonableness and necessity of Shannon's past medical expenses, as is explained more fully below. But to briefly summarize:

> 1. The documents attached to the affidavits are not itemized statements as the affidavits say they are. They are one-line summaries of billings and collections.
>
> 2. The documents attached to the affidavits are not billing records as the affidavits say they are. They are summaries of billing records.
>
> 3. The affidavits of Rawlings and Buchanan circularly say that the information in the attached records was transmitted to their companies by an employee or representative of the *subrogation company* who had personal knowledge of the information, although the information in the attached summaries was for billings and collections as to numerous, diverse medical providers in Texas. The affidavit of

17

Heeney was of the same nature, except in her affidavit Heeney says that an employee or representative of the claims administrators, Cigna Healthcare and Anthem Blue Cross Blue Shield had personal knowledge of the information in the attached summaries and transmitted it to Vengroff, Williams and Associates.

4. The affidavits of Rawlings and Buchanan, presented to support charges made in Houston, say that Rawlings and Buchanan, as affiants, are familiar with charges made "in this vicinity"—that is, in Kentucky and Wisconsin, respectively—and that the charges are reasonable for charges made in "this vicinity." Then, switching tracks, Rawlings and Buchanan aver that the services provided were necessary and the charges were reasonable "at the time and place the services were provided"—that is, in Houston, a completely different area of the country. Heeney's affidavit is better in that she avers that "[t]he amount charged and paid for the services were reasonable at the time and place that the services were provided." But she says nothing about whether the services were necessary.

As noted, Rawlings and Buchanan stated in their affidavits that they were familiar with customary charges for "like or similar services rendered in *this vicinity*" and that the charges reflected on the records attached to their affidavits "are reasonable for like or similar services rendered in *this vicinity*." (Emphasis added). The vicinity of Rawlings's principal office and the location where Carroll Rawlings executed her affidavit was Oldham County, Kentucky. The vicinity of Meridian Resource's principal office was Waukesha, Wisconsin, and the vicinity of where Christi-Jo Buchanan executed her affidavit was Waukesha County, Wisconsin. But averring that they are familiar with customary charges in Kentucky and Wisconsin does not speak to their familiarity with charges for services provided in Houston. And the affidavits do not demonstrate that the affiants had any knowledge about the rendering of or the customary charges for medical care in Houston. It is in that context that both Rawlings and Buchanan averred that "the amount charged and paid for the services were reasonable *at the time and place that the services were provided*"—that is, Houston. Moreover, the affidavits are devoid of information to show that any

18

of the three affiants had any training or held any position that would qualify them to give competent testimony as to the necessity of the medical procedures and services to treat Shannon, even though Rawlings and Buchanan said they were. Heeney did not bother to aver that the services for which her company was seeking to recover were necessary.

The affidavits are internally inconsistent, do not substantially comply with the Legislature's intent as to requirements for this type of affidavit, and fail in several ways to support jury findings based on basic evidentiary requirements. That is understandable because the affiants were asked to verify the medical necessity of medical services rendered in another state by persons and entities with whom they had no discernable connection, that were provided to a person whose condition they had no demonstrated knowledge of, by affidavits containing language distorted to make the affidavits appear to conform to language specified by the Texas Legislature. But as demonstrated above, the affidavits do not conform to the Legislature's requirement for proof of medical expenses by affidavit. Section 18.001 is designed to allow proof by means of an affidavit as to services and charges for the services by either the provider of the services or someone in charge of records of the provider. TEX. CIV. PRAC. & REM. CODE § 18.001. And when affidavits are made by such providers or their employees or representatives, then the problems demonstrated by these three affidavits—internal inconsistency, lack of demonstrated knowledge of the services or of how the records of the services were made, and violation of basic evidentiary rules that protect the integrity of the trial process—for the most part disappear.

The Court's interpretation fails to cabin the statute within its logical limits. "We look to and rely on the plain meaning of a statute's words as expressing legislative intent unless a different

meaning is supplied, is apparent from the context, or the plain meaning of the words leads to absurd or nonsensical results." *Pedernal Energy, LLC v. Bruington Eng'g, Ltd.*, 536 S.W.3d 487, 491 (Tex. 2017). And we do not read parts of a statute in isolation, but read the statute as a whole, seeking the Legislature's intent. *EXLP Leasing, LLC v. Galveston Cent. Appraisal Dist.*, ___ S.W.3d ___, ___ (Tex. 2018). Construing section 18.001 to permit anyone, no matter what the person's training and qualifications are, and no matter how far removed from the actual provider of the medical care and that provider's employees and representatives the person is, to support a judgment by swearing under oath to the necessity of medical expenses of that provider even though the affiant neither claimed to have nor demonstrated knowledge of the services rendered except for third-hand information of an apparent cursory nature, is an absurd and nonsensical result. *Id.* Further, it may well subject the statute to a constitutional challenge. *See In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). However, as discussed below, reading sections 18.001 and 18.002 together compels the conclusion that the Legislature did not intend such results as will flow from the Court's construction of the statutory language.

### B. The Billing Summaries

As for whether the affidavits comply with sections 18.001(c)(2) and 18.001(c)(3) requiring the affidavit to "include an itemized statement of the service and charge," section 18.002 demonstrates the Legislature's intent by means of providing exemplar forms for the affidavits. *Id.* § 18.002(c).[1] The exemplars demonstrate legislative intent that documents attached to section

---

[1] The Civil Practice and Remedies Code provides the following examples of adequate affidavits, although the exemplars are not exclusive, and affidavits that substantially comply with section 18.001 are sufficient:

18.001 affidavits must be (1) itemized as to the services provided and charges for the services and (2) the records either of (a) the person who performed the services or records based on information transmitted by either the person who performed the services or an employee or representative of the person who performed the services—provided the employee had knowledge of the services provided, or (b) persons with knowledge of the services provided, or records made based on information transmitted by persons with knowledge of the services provided. In all instances, however, the exemplars, when considered in conjunction with the language of section 18.001(c)(2), demonstrate legislative intent that to comply with the requirements of section 18.001, affidavits must be made by certain categories of persons, as discussed in the preceding section, and that documents attached to the affidavits must show that the services and charges were made by persons with

---

I am the person in charge of the records of (PERSON WHO PROVIDED THE SERVICE). . . .
        The attached records are kept by me in the regular course of business. The information contained in the records was *transmitted to me* in the regular course of business *by (PERSON WHO PROVIDED THE SERVICE) or an employee or representative of (PERSON WHO PROVIDED THE SERVICE) who had personal knowledge of the information.* The records were made at or near the time or reasonably soon after the time that the service was provided. The records are the original or an exact duplicate of the original.
        The service provided was necessary and the amount charged for the service was reasonable at the time and place that the service was provided.

TEX. CIV. PRAC. & REM. CODE § 18.002(b) (emphasis added). Another form states:

I am a custodian of records for _____. Attached to this affidavit are records that provide an *itemized statement of the service and the charge for the service* that _____ provided to _____ on _____. . . .
        The attached records are kept by _____ in the regular course of business, and it was the regular course of business of _____ *for an employee or representative of _____, with knowledge of the service provided*, to make the record or to transmit information to be included in the record. The records were made in the regular course of business at or near the time or reasonably soon after the time the service was provided. The records are the original or a duplicate of the original.

*Id.* § 18.002(b-1) (emphasis added).

21

knowledge of the services rendered or by persons who received information from persons with knowledge of the services rendered.

The documents attached to the affidavits in this case do not come close to measuring up. Rawlings, Buchanan, and Heeney attached to their affidavits what apparently are documents generated by each of their respective subrogation agencies, as indicated by the fact the documents attached to each of the three affidavits have different formats with different categories of information. The documents fairly clearly are not bills from medical providers, because each document lists numerous different providers. Rather, based on the information in the affidavits, they can only be summaries of information received from the payer entities. According to the affidavits, the amounts paid by the three payer entities were as follows: Aetna—$61,428.60; Unicare—$322,644.30; and Federal Express Benefit Plan—$319,912.99. But, according to the affidavits, the entities do not claim to have had any part in providing the services rendered to Shannon. The documents are not itemized billing records from the medical providers; instead, the attachments to the affidavits are cursory summaries of charges by providers and payments on those charges by the payer entities. Thus, the statements in the affidavits that "Attached to this affidavit are records that provide an itemized statement of the claims paid" are patently false. The affiants refer to the "attached billing records" as having been kept by the affiants or the subrogation entities in the regular course of business. While the documents attached to the affidavits may have been kept in the regular course of business by the subrogation entities, the subrogation documents on their face are not billing records. The affiants each circularly state that the attachments to their affidavits are based on information transmitted to the affiant by an employee or representative of the

22

subrogation company itself, or, in the case of Heeney, by claims administrators for Federal Express Benefit Plan "who had personal knowledge of the information." But none of the affiants state that the persons who transmitted the information had knowledge of the services provided or the necessity of the services, as the section 18.002 exemplar affidavits show the Legislature intended.

I would hold that the trial court erred by overruling objections of OGA and Dr. Gunn to the admission of the documents attached to the subrogation agents' affidavits. Absent the documents, there was no evidence to support the finding as to Shannon's past medical expenses. Accordingly, I would reverse the court of appeals' judgment on this issue.

And even if the documents attached to the affidavits of Rawlings and Buchanan were properly admitted, the documents attached to the affidavit of Heeney were admitted in error. She did not state in her affidavit that the services in the documents were necessary for Shannon's treatment. Thus, there is no evidence to support that part of the judgment awarding past medical expenses paid by the Federal Express Benefit Plan.

### III. Conclusion

I would reverse the judgment of the court of appeals as to both the future and past medical care expenses and remand to the trial court for further proceedings.

In the alternative, I would reverse the judgment as to the past medical expenses paid by the Federal Express Benefit Plan and render judgment that McCoy take nothing as to those expenses.

I respectfully dissent.

23

_____

Phil Johnson
Justice

**OPINION DELIVERED:** June 15, 2018