

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00254-CV

_____

DYNOCOM INDUSTRIES, INC., Appellant

V.

TYPE A MOTORSPORTS OF TEXAS, LLC, Appellee

On Appeal from County Court at Law No. 3
Tarrant County, Texas
Trial Court No. 2020-005207-3

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

After Appellant Dynocom Industries, Inc.'s agreement to manufacture and sell a dynamometer to Appellee Type A Motorsports of Texas, LLC fell through, the parties asserted competing breach of contract claims, and the trial court, sitting as the factfinder, was required to choose between their competing narratives. Type A offered testimony and documentary evidence that Dynocom had failed to notify it that the machine had been manufactured and was ready for full payment and delivery, while Dynocom offered contrary testimony that it had notified Type A, but Type A had failed to pay. The trial court believed Type A, and Dynocom now challenges the legal sufficiency of the trial court's judgment.[1] Because the case turns on a credibility determination—the province of the factfinder—we will affirm.

## I. Background

Although the parties dispute the relevant facts, when reviewing the legal sufficiency of the evidence, we must view the record "in the light most favorable to

---

[1]Dynocom raises three issues in its brief, but its sufficiency argument—which forms the basis for two of its three issues—is dispositive. We therefore do not reach Dynocom's third issue, which challenges alternative theories of breach. *See* Tex. R. App. P. 47.1; *infra* note 16. And we do not address the supplemental issue Dynocom attempts to raise in its reply brief because "[t]he law is well-settled that a party cannot raise new issues in a reply brief." *Midwestern Cattle Mktg., LLC v. Nw. Cattle Feeders, LLC*, No. 02-17-00274-CV, 2018 WL 1414834, at *6 (Tex. App.—Fort Worth Mar. 22, 2018, pet. denied) (mem. op.); *see Anderson v. Innovative Insulation, Inc.*, No. 02-21-00183-CV, 2021 WL 5742082, at *7 n.12 (Tex. App.—Fort Worth Dec. 2, 2021, no pet.) (mem. op.) (reciting rule and declining to consider new argument raised in reply brief).

the party in whose favor the [judgment] has been rendered." *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). We recite the facts in that light.

## A. Contract

Type A is a motorsports services company that, among other things, buys, sells, and services race cars. In 2019, Type A contacted Dynocom to purchase a dynamometer—a piece of machinery used to measure the torque of race cars and other high-performance vehicles.[2] Dynocom, as the name implies, manufactures and sells dynamometers.

Type A's owner, Martin Robertson, toured Dynocom's manufacturing facility and met with Dynocom's founder (Paul Arseneau) and its sales director (Arseneau's wife, Allison Blackstein[3]) to discuss dynamometer pricing, payment terms, manufacturing time, and delivery arrangements. Blackstein gave Robertson a quote

---

[2]Dynocom's founder, Paul Arseneau, explained that the type of dynamometer at issue is a piece of machinery that is bolted to the hub of a high-performance vehicle to measure "wheel torque or axle torque," and "[f]rom that torque[,] they can measure acceleration, work power, energy loss, drivetrain loss, [and] a full slew of scientific parameters of a vehicle."

[3]Robertson testified that Blackstein and Arseneau owned Dynocom, and Arseneau confirmed that he founded the company and owned 90% of it. Blackstein, though, testified that neither she nor Arseneau were owners and that she did not know who owned Dynocom.

for the discounted[4] purchase price of $60,000 with an estimated delivery time of 12 to 14 weeks.[5]

After the meeting, Robertson (acting for Type A) placed an order with Dynocom, and he worked through Blackstein as his exclusive point of contact.[6] Blackstein prepared an "order confirmation" contract that mirrored the terms of Dynocom's quote, and Robertson signed the contract.

In that contract, Dynocom agreed to sell the machine for $60,000, and Type A agreed to pay "50% down [and] 50% due before equipment ships." Type A also "agree[d] to provide payment for shipping to [Dynocom] as soon as practicable but in no event longer than three (3) days following notification that the products are ready for shipment." As for the delivery timeframe, the contract repeated the delivery estimate of 12 to 14 weeks, but cautioned that "[d]elivery dates [we]re contingent upon payment received and are subject to change," and that Dynocom "reserve[d] the

---

[4]The parties agreed that $60,000 was a discounted price, although they disagreed regarding the reason for the discount. Dynocom's itemized quote indicated that the normal price would have been $84,995.

[5]The quote was provided to Type A's related entity, Evolution Race Development, but Type A was the entity that ultimately purchased the machine.

[6]Blackstein testified that she was the primary contact but that other individuals at Dynocom also communicated with Type A regarding the status of Type A's order. But Arseneau indicated that Blackstein had primary responsibility for communicating with Robertson, and Robertson testified that "all of [his] communication after the initial introduction . . . was directly with [Blackstein]."

right to adjust the delivery schedule at time of order to reflect the then[-]current production schedule."

Within days of signing the contract on April 30, 2019, Robertson texted Blackstein with Type A's mailing address and e-mail address, Dynocom sent Type A an invoice for the machine, and Type A paid the $30,000 down payment.

## B. Delivery Delays

The dynamometer was not ready to ship within 12 to 14 weeks. After more than 16 weeks—on September 7, 2019—Robertson sent Blackstein a text message to ask when the machine would be ready to ship. Blackstein, receiving the text on a Saturday, promised that the dynamometer would be ready "[v]ery soon" and that she would check on its status on Monday. But she never followed up. Robertson texted again that Wednesday (September 11), and again Blackstein agreed to check, but again she failed to follow through. Nine days later, the cycle repeated.

Then, in mid-September, a new routine began. Blackstein began repeatedly promising that the machine would be ready to ship in a few weeks:

[Robertson:] Can I get info on when my dyno will be ready?

[Blackstein:] Sure 😬 a few weeks

[Robertson:] Thank you

[Formatting altered and time stamps omitted.] The same exchange repeated almost four weeks later, in mid-October:

[Blackstein:] 3 weeks dynos will be ready

[Robertson:] Great thanks

[Formatting altered and time stamps omitted.] And again five weeks after that, in late November:

[Blackstein:] Hi [e-mail address] good email to send invoice to? Dyno will be ready week of December 9th

[Robertson:] Yes that is correct. Thanks

[Formatting altered and time stamps omitted.] Then the text messages stopped.

For six months, there was no communication between the parties.[7] Dynocom did not update Type A on the machine's status, nor did Type A follow up with Dynocom.[8]

Finally, in June 2020, the routine restarted:

[Robertson:] I'm assuming the dyno is ready to pick up?

---

[7]During this six-month period, in March 2020, the Texas Governor issued a disaster proclamation "certifying that COVID-19 poses an imminent threat of disaster." The Governor of the State of Tex., Proclamation 41-3720, 45 Tex. Reg. 2094, 2094–95 (2020) (issued Mar. 13, 2020). And in the weeks that followed, the Governor issued "a flurry" of executive orders that were "designed to mitigate COVID-19's spread" but that "meaningfully changed Texans' day-to-day activities." *In re Luther*, 620 S.W.3d 715, 718–19 (Tex. 2021) (orig. proceeding) (discussing executive orders issued in March and April 2020); *see, e.g.*, The Governor of the State of Tex., Exec. Order GA-08, 45 Tex. Reg. 2271, 2271 (2020) (issued Mar. 19, 2020).

[8]Robertson testified at trial that he did not follow up for several months because he "got preoccupied with another business" of his that was veering towards bankruptcy due to market conditions.

[Blackstein:] Hello Marty nice to hear from you!  Ah no it's not but it can be 🙏

[Robertson:] When can you guys turn it out?

. . . .

We would like to get it as soon as you guys can put it together.

[Blackstein:] Understood!  Will get you an update tomorrow

[Formatting altered and time stamps omitted.]

Another month passed, and Blackstein called to ask if she and Arseneau could come to Type A's facility to make sure Type A had sufficient electrical equipment for the dynamometer to operate.  Then, on the morning of the scheduled visit, Blackstein texted Robertson and canceled because Arseneau was "home with a repair guy."  The parties rescheduled for the next month, August 2020.

By then, Type A had begun to pursue its legal options.  Type A's attorney sent Dynocom a demand letter in early August, notifying Dynocom that it had breached its contract by failing to manufacture the dynamometer or ship it to Type A, and "demand[ing] that [Dynocom] immediately return Type A's payment in the amount of $30,000."  Meanwhile, Type A continued to try to work with Dynocom to complete the deal outside of court, and Robertson began pressing Dynocom to commit to a delivery date.  When Blackstein and Arseneau finally visited Type A's facility to review its electrical equipment, Robertson referenced the demand letter and warned that "if

7

[Dynocom] couldn't give [Type A] a reasonable commitment of a time to complete [the dynamometer] and deliver it," then Type A would "have no choice but to file suit." Despite the ultimatum, when Robertson texted in the days that followed, Blackstein continued to stall:

> [Robertson:] I need a date you can have the Dyno ready. Need an email from you on what I can expect.

> [Blackstein:] Yes will send this week gears will [b]e completed on September 15th

Blackstein then asked Robertson to verify a "good e-mail address," and Robertson provided a new one. But the end of the week came and Blackstein still had not specified a delivery date via text or e-mail. Robertson followed up one last time:

> [Robertson:] Need an email with commitment date that I can agree to <u>today</u> or I will have to proceed with the suit.

Blackstein never provided a commitment date—via text message, e-mail, or otherwise—and Robertson never received a final invoice or other notification that the dynamometer was ready for full payment and delivery.

## C. Lawsuit

Finally, on September 1, 2020—more than a year after the dynamometer's initial 12-to-14-week delivery period had expired—Type A filed suit. Type A alleged that Dynocom's failure to deliver the dynamometer breached the contract, and it sought the return of its $30,000 down payment. Dynocom responded by arguing, as

8

both an affirmative defense and a counterclaim, that Dynocom had breached the contract "by failing and refusing to pay the balance of the purchase price."

## D. Bench Trial

The case was tried to the bench. The central factual dispute, and the focus of the parties' competing testimony, was whether Dynocom had notified Type A that its dynamometer had been completed and was ready for full payment and delivery.

Robertson testified to the text-message exchanges recounted above and confirmed that almost all of his communications with Blackstein had occurred via text message with "maybe two to three phone calls during the entire time frame." Copies of the text-message exchanges were admitted into evidence.

Robertson stated that, as the text messages showed, he had never received notification that the dynamometer had been completed or was ready for payment or delivery. He never received an invoice for the machine, was never asked to pay for the dynamometer's shipping costs in anticipation of delivery, and he was never asked to pay the final $30,000 on the machine.

Blackstein disputed this.[9] She testified that Dynocom had a dynamometer ready for delivery at almost every anticipated deadline; there was a dynamometer

[9]Although the bench trial was conducted via Zoom, Dynocom's trial counsel was in the same room as Blackstein throughout her testimony, and counsel was repeatedly chastised for coaching the witness. The trial court warned that it would take such coaching "into account when [it] determine[d] the credibility of the answers given by the witness."

9

ready for delivery 12 to 14 weeks after Type A placed its order, there was a dynamometer ready approximately "3 weeks" after her October text anticipating the same, and there was another dynamometer "ready [the] week of December 9th" as her text message had anticipated. She claimed that, on each occasion, she called or e-mailed Robertson to notify him that the machine was ready, and on the latter two occasions, she "e-mailed an invoice to him." But no e-mails or invoices were admitted into evidence to support her testimony, nor was there any documentary evidence of Blackstein's alleged phone calls to Robertson.[10]

Arseneau also testified. Unlike Blackstein, Arseneau acknowledged that there was a delay beyond the initial 12-to-14 week timeframe. But he agreed with Blackstein that Type A's dynamometer was ready the week of December 9, 2019. He did not claim to have notified Type A that the dynamometer was ready at that time, though;[11] he only described the company's procedures, which included e-mailing a

_____

[10]During Blackstein's testimony, she indicated that the e-mails and call logs documenting her alleged communications with Robertson had been overlooked when Dynocom had gathered documents for production in discovery, and Dynocom's trial counsel referenced previous trial court rulings that had excluded these and other documents that had not been produced in discovery. Whatever the reason, Blackstein's alleged e-mails, invoices, and call logs were not admitted into evidence, and Dynocom does not challenge the exclusion of these documents on appeal.

[11]Arseneau testified that he had seen an e-mail that Blackstein sent to Robertson, and that, on one occasion, he had instructed her to call Robertson via phone. Arseneau did not discuss the content or date of either of these communications.

10

final invoice to the customer when the dynamometer was ready for full payment and delivery.

Arseneau further testified that, when he and Blackstein visited Type A's facility in August 2020—after Type A had sent its demand letter—Arseneau told Robertson that the dynamometer would be ready by the end of September. Blackstein remembered similarly, and she pointed to her subsequent text message to Robertson that the "gears w[ould] [b]e completed on September 15th" as support for the September delivery estimate. But Blackstein and Arseneau disagreed as to whether the machine had actually been ready for delivery in September 2020. Arseneau stated that the dynamometer was ready, while Blackstein testified that it was not.

## E. Judgment

After hearing the parties' competing testimony, the trial court entered judgment for Type A. It awarded Type A $30,000 in actual damages—the amount of its original down payment—plus attorney's fees and prejudgment interest, and it ordered that Dynocom take nothing on its counterclaim.

## II. Sufficiency of the Evidence

The central dispute on appeal is the same as it was at trial: whether Dynocom notified Type A that the dynamometer was ready for full payment and delivery. Only now, Dynocom raises the issue as a sufficiency challenge.

Dynocom claims that the evidence conclusively established that it had notified Type A that the machine was ready for full payment and delivery and that there was

11

no evidence to support the trial court's implied finding[12] to the contrary.[13] It presents this argument in multiple forms, claiming that (1) there is no evidence that Type A satisfied all conditions precedent to delivery because it did not fully pay for the dynamometer, (2) there is no evidence that Type A performed its own contractual obligations because it did not fully pay for the dynamometer, and (3) Type A materially breached the contract by failing to pay for the dynamometer, excusing Dynocom's subsequent failure to deliver the machine. However, all of these arguments are premised on Type A's assertion that the "undisputed" evidence "conclusively established that Dynocom notified Type A that the dyno was ready for delivery on the week of December 9, 2019," thus triggering Type A's contractual payment obligation. Dynocom's real challenge, then, is to the sufficiency of the evidence to support the trial court's implied finding that Dynocom never notified Type A that the dynamometer was ready for full payment and delivery.[14]

To prevail on its legal sufficiency challenge, Dynocom must show that (1) the record contains no evidence of a vital fact necessary to the challenged finding, (2) the

---

[12]The trial court did not file findings of fact or conclusions of law, but the judgment implies all findings of fact necessary to support it. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017).

[13]Dynocom's brief frames its sufficiency challenge as two issues.

[14]All parties agree that Type A was required to pay the remainder of the purchase price *after* it received notification that the dynamometer was completed and ready for delivery but *before* delivery would actually occur.

12

rules of law or of evidence bar the court from considering the only evidence offered to prove a vital fact, (3) there was no more than a mere scintilla of evidence offered to prove a vital fact, or (4) the evidence conclusively establishes the opposite of a vital fact. *See Gunn*, 554 S.W.3d at 658. We view the evidence in a light most favorable to the challenged finding, indulging every reasonable inference in its favor, considering all supportive evidence that a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *Id.* at 658; *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The evidence supporting the challenged finding constitutes more than a scintilla if it would enable reasonable and fair-minded people to differ in their conclusions; it constitutes a scintilla or less if it does "no more than create a mere surmise or suspicion" about the vital fact's existence. *See Gunn*, 554 S.W.3d at 658.

Generally, "evidence becomes conclusive (and thus cannot be disregarded) when it concerns physical facts that cannot be denied." *Catholic Diocese of El Paso v. Porter*, 622 S.W.3d 824, 834 (Tex. 2021). In the absence of physical evidence, when a challenged finding hinges on competing witnesses' testimony regarding a vital fact's existence, the factfinder is free to believe one witness over another, and reasonable and fair-minded people can differ in their conclusions. *See id.* at 834 (overruling legal sufficiency challenge because "[i]n the absence of physical evidence such as receipts [documenting the disputed transaction], the jury was free to believe either [one witness's] testimony or [the other's]"); *Hutchison v. Pharris*, 158 S.W.3d 554, 568 (Tex.

13

App.—Fort Worth 2005, no pet.) (recognizing that, in a battle of competing evidence, "it is the sole prerogative of the [factfinder] to determine the weight and credibility of the witnesses, the obligation of the respective advocates to persuade them, and our obligation to see that the process was fair and carried out according to the rules" (internal quotation marks omitted)); *see also Allen v. Hutchison Const., Inc.*, No. 03-00-00743-CV, 2002 WL 275219, at *5 (Tex. App.—Austin Feb. 28, 2002, pet. denied) (not designated for publication) (holding that evidence was sufficient to support challenged findings because "the issue came down to credibility, as both parties presented conflicting testimony" and "[i]t was within the trial court's discretion to resolve the conflicts").

Here, the parties presented competing testimony as to whether Dynocom had notified Type A that the dynamometer was ready for full payment and delivery. Robertson testified that he had never been notified that the dynamometer was ready. He produced Blackstein's text messages—physical evidence—to corroborate his story, but it is hard to imagine what physical evidence Robertson could have offered to conclusively establish that this was the sum total of his communications with Dynocom. For that, he relied on his testimony.

And Blackstein disputed this testimony; she claimed that the text messages were not the sum total of their communications. Blackstein testified that she repeatedly notified Robertson that the machine was ready for full payment and delivery, that she repeatedly e-mailed him invoices, and that she repeatedly requested

14

full payment. Although Arseneau's testimony offered some support for her story, he did not testify that he had personally witnessed any of the alleged notifications. And Dynocom did not offer any e-mails, invoices, phone logs, or other physical evidence to validate Blackstein's testimony. As presented, this case was the quintessential he-said, she-said dispute.

Dynocom's trial theory recognized as much. It argued that Blackstein's testimony proved that she had sent Robertson e-mail and invoice notifications, and that although there was no physical evidence documenting such e-mails and invoices, their existence was supported by the e-mail references in the parties' text-message conversations.[15] But on appeal, Dynocom attempts to distance itself from the undocumented e-mails and invoices.

---

[15]During Type A's cross-examination of Blackstein, Blackstein and Dynocom's trial counsel admitted that there was no documentary evidence of notification:

[Type A Counsel:] And we have nothing in writing from [Dynocom] that's in evidence that states that you're demanding payment or expecting payment or that has to be paid by a certain date or anything of that nature so that you would deliver the dyno, do we?

[Blackstein:] Yes, you do.

[Type A Counsel:] What do we have in evidence that shows that?

[Blackstein:] The order confirmation that's signed by Marty Thompson. [sic]

[Type A Counsel:] Since then, you never sent a single document, we don't have any documents in evidence where you

15

Dynocom now argues that Blackstein's text message that the dynamometer "will be ready week of December 9th" was itself a notification that the dynamometer was ready for full payment and delivery. We disagree. A statement that the dynamometer "will be" ready is not the same as a statement that it *is* ready for payment and delivery. *Compare, e.g.*, *Will*, Webster's Third New International Dictionary 2616 (2002) (defining "will" as "used to express simple futurity," and "used to express desire, choice, willingness, [or] consent"), *with Be*, Webster's Third New International Dictionary 189 (2002), (defining "be" as "to have an objective existence," to "have reality or actuality," or "to have, maintain, or occupy a place, situation, or position"), *and Is,* Webster's Third New International Dictionary 1197 (2002) (recognizing "is" as a form of "be" and defining it as "that which is factual, empirical, actually the case, or spatiotemporal—contrasted with *ought*"). This is particularly true given the context of Blackstein's text message, which came after a

|  | state, hey, before we send this, you got to pay or I need your payment now, or anything of that nature, do we? |
|---|---|
| [Blackstein:] | Yes, I sent him copies of the invoice with the balance owed. |
| [Type A Counsel:] | But we have no e-mail in evidence that shows that you sent the invoice, do we? |
| [Dynocom Counsel:] | That's correct. |
| [Blackstein:] | That's correct. Okay. Per my attorney that's correct. |

16

series of similarly anticipatory texts that had all culminated in delays. Even if Dynocom had argued this theory at trial, a reasonable factfinder could have concluded that the "will be ready" message was not itself a notification that the dynamometer was actually ready for full payment or delivery—either at the time of the message or on a date certain.

Ultimately, then, the trial court was presented with a credibility assessment: it could believe Robertson's version of events or Blackstein's. Both versions were supported by more than a scintilla of testimonial evidence, and the factfinder chose to believe Robertson's version. It is the factfinder's prerogative to "choose to believe one witness and [to] disbelieve another[; r]eviewing courts cannot impose their own opinions." *City of Keller*, 168 S.W.3d at 819; *see Catholic Diocese of El Paso*, 622 S.W.3d at 834 (quoting *City of Keller*).

Because the evidence was not conclusive and the factfinder was "the sole judge[] of the credibility of the witnesses and the weight to give their testimony," we overrule Dynocom's sufficiency challenge. *City of Keller*, 168 S.W.3d at 819. And because this issue is dispositive, we decline to address Dynocom's other arguments.[16] *See* Tex. R. App. P. 47.1.

---

[16]Dynocom's third issue challenges alternative theories of breach that it claims Type A relied upon at trial, arguing that Dynocom was not contractually required to deliver the machine on a date certain before it had received full payment and it was not required to submit a second invoice for the machine. But Type A did not argue these theories at trial, and it does not rely on them on appeal. Regardless, because we have already sustained the trial court's judgment on the theory of breach advanced at

17

## III. Conclusion

The parties each presented more than a scintilla of evidence to support their competing narratives. The trial court made a credibility determination, and the evidence is sufficient to support it. Accordingly, we affirm the trial court's judgment. Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: April 21, 2022

---

trial—failure to notify Type A that the dynamometer was ready for full payment and delivery—we need not address Dynocom's alternative arguments. *See* Tex. R. App. P. 47.1; *cf. Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766 (Tex. 2011) (recognizing that "[i]n the absence of findings of fact or conclusions of law, a trial court's judgment will be upheld on any theory supported by the record").