**Affirmed and Memorandum Opinion filed October 29, 2024**



In The

# Fourteenth Court of Appeals

### NO. 14-24-00368-CV

## IN THE INTEREST OF M.R.H., M.J.H., JR., F.A.H., AND M.C.H., CHILDREN

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2022-01239J**

## MEMORANDUM OPINION

Appellant M. H. (Mother) appeals from the trial court's Final Decree in a Suit Affecting the Parent-Child Relationship which appointed Mother to be possessory conservator of her four children and appointed the maternal grandparents as the joint managing conservators. Mother argues the trial court abused its discretion in two ways. First, Mother asserts that insufficient evidence supports the trial court's decision to appoint the maternal grandparents as the joint managing conservators of the children. Second, Mother contends that insufficient evidence supports the trial court's decision to appoint her a possessory conservator

with restricted access to the children. Because we conclude that sufficient evidence supports both decisions by the trial court, we affirm.

## BACKGROUND

The Department of Family and Protective Services (the Department) filed an "Original Motion to Modify for Conservatorship, and for Termination in a Suit Affecting the Parent-Child Relationship" related to four children: M.R.H. (Mindy), M.J.H., Jr. (Mitch), F.A.H. (Fran) and M.C.H. (Max). At the time of the trial, Mindy was twelve, Mitch was nine, Fran was four, and Max was two. The children were removed from Mother and Father's residence and the trial court placed them in the Department's temporary conservatorship on an emergency basis that same day. A show cause hearing was held soon thereafter and the trial court named the Department temporary managing conservator of the children. The case eventually went to trial in early 2024. Several exhibits, including the Removal Affidavit, were admitted into evidence without objection prior to the start of witness testimony.

### Shawn Carter

Shawn Carter, the Department caseworker assigned to the children, was the first witness to testify. Carter testified that he had been the caseworker for about six months at the time the trial commenced. Carter stated that the four children had been placed with the maternal grandparents and they are doing well in the placement. Carter continued that the Department's goal for the children was "relative or fictive kin conservatorship with a concurrent goal of relative or fictive kin adoption." Carter stated that the maternal grandparents had agreed to accept Permanency Care Benefits and were working on getting licensed at the time of trial.

2

Carter testified that the children were brought into the Department's care for multiple reasons. One reason arose because Fran swallowed magnets and had to be hospitalized. The allegation was that the children were not being supervised when they accompanied their parents to work. In addition, the oldest daughter, Mindy, reported that M. H., Sr. (Father) had sexually assaulted her. Carter further testified that Mindy eventually recanted her allegation against Father. According to Carter, Father also had other sexual assault charges predating the Department's involvement. The alleged victim in those cases was his client at a massage parlor.

The Department also alleged that Father allowed ten-month-old Max to go underwater while bathing him because Father was not paying attention. At the time that Fran was hospitalized, Father seemed to suffer a psychotic break and a mental health warrant was issued for him. A family plan of service was developed for Father. Carter testified that Father participated in some parts of the plan, such as a psychiatric evaluation. The evaluation stated Father may need psychotropic medications and also that he needs to accept that these medications were essential for him to be medically compliant. Carter continued that he was unaware of Father's status, including whether he was complying with the medication requirement, because he had not spoken with Father for several months. Prior to that last conversation, Carter testified that he only had contact with Father via text, but even this rarely occurred. Carter stated that he had reached out to the provider who was to administer the psychological evaluation, but he had not heard back. Carter therefore was unable to confirm whether Father had completed the psychological evaluation.

Carter reported that his last meeting with Father occurred in a Dollar Tree parking lot. Carter stated that Father was uncooperative during the meeting. Carter testified that Father blamed the Department for Fran swallowing the

magnets.  Carter continued that he did not understand what Father was saying because it did not make sense.  Carter said that Father then started talking about demons and God, among other things.  Carter did not think Father appeared rational or properly medicated during this meeting.  Father then told Carter that he did not want any involvement with the Department and that the Department should just deal with Mother and give the children to her.  When asked about his contact with Father since that parking-lot meeting, Carter replied that Father occasionally responds to text messages.  Carter continued that Father showed no interest in scheduling another face-to-face meeting.

Carter testified that Father was asked to participate in couples therapy with Mother.  Carter  further indicated this therapy started just before trial.  Carter said that the referrals were made months before the therapy started and he did not know why there was a delay in starting the therapy.  Carter testified that Father was asked to complete a domestic violence evaluation, but he did not do so.  Carter continued that Father also did not complete his individual therapy.  Carter explained that Father was unsuccessfully discharged from the therapy because the therapist did not believe Father had the empathy needed to complete treatment successfully.

Carter's testimony then turned to Father's employment.  Carter testified that he had not received pay stubs or any other documentation confirming Father worked at Dollar Tree.  Carter testified Father was living in a shed in the back of the family's burned home.  Carter visited the shed the day before and stated that it was not suitable for children.  Carter testified Father has not visited the children since Carter became the caseworker on the case.

In recounting the reasons the Department intervened and brought the children into the Department's care, Carter stated that Mother reported being

scared and suicidal. The children reported that Mother would go through periods of time during which she would stay in her room all day, leaving Mindy responsible for their care. Carter then turned to Mother's services. Carter reported Mother had completed family therapy with the two oldest children but the therapist raised concerns about Mother's behavior during the sessions. The therapist thought Mother was overbearing towards the children. The children's most strongly expressed concern with the therapy was that the sessions were early on Saturday mornings. Mindy stated that she did not understand why her mother became so emotional during the sessions. The children also expressed concern that Father would return to their home. The therapist recommended that (1) Mother complete a psychological evaluation, (2) therapy with the children should cease, (3) Mother should continue individual therapy, and (4) the children should stay with their grandparents. Mother completed her psychological evaluation the Monday before the trial began. Carter reported that Mother had previously completed a psychological evaluation in September of 2022. Mother also completed two psychiatric evaluations, one in November of 2022 and the other in April of 2023. Carter did not know why a second psychiatric evaluation was completed. Carter testified that the evaluations resulted in an ADHD diagnosis, a bipolar diagnosis, and an anxiety diagnosis. The evaluations also recommended that Mother take parenting classes and substance abuse programming. Carter reported Mother had been drug tested and she had not tested positive since he became involved in the case.

Carter testified Mother has visited the children during the case and that he has attended the visits. Carter reported Mother did a great job balancing her time between the children. Carter described Mother as engaged and loving. Carter stated Mother has not missed any visits with the children. Carter stated there were

5

reports that Mother told the children that she was visiting them for the last time. Mindy expressed concern after that visit about Mother's mental health. Based on concerns about Mother's mental health and possible suicidal ideation, the Department requested continued supervised visitations between Mother and the children.

According to Carter, Mother lives in her own home. Carter visited Mother's home the day before his testimony. Carter testified that Mother's home was clean and orderly compared to the first time he visited. Carter described Mother's home during his first visit as dirty and unkempt. During his first visit Carter said he found bags of garbage in the home and observed feces in the kitchen area. According to Carter, Mother had two roommates, but Mother told Carter the roommates would be leaving at the end of the month. Carter stated that Mother's roommates were eighteen and nineteen. According to Carter, no background checks had been completed on the roommates. Carter explained they would be essential if Mother was allowed unsupervised visits with the children.

Carter testified Mother is employed, which he verified by visiting her place of employment. Carter did not know the date Mother started her employment, but said Mother has been employed at the same place since he has been the caseworker on the case. In addition, Mother reported that Father is giving her $2000 a month.

Carter testified that Mindy is working with a therapist. Carter said the therapist is helping Mindy to adjust to living with her grandparents and to deal with the domestic violence she observed in her parents' home.

According to Carter, there were reports that Mother recorded Mitch walking home from school during the case. Carter testified this behavior created a concern for the Department because it was not appropriate behavior by Mother. Carter explained that Mitch told him that he saw Mother's car, but he did not see Mother.

Carter also testified that Mitch was upset because Mother had parked near the grandparents' home. Carter said Mother did not have permission to be near the grandparents' home outside of visitation times.

Carter reported that Mother was in therapy with her mother, M. L. (Grandmother). Only one session had been completed by the time of Carter's testimony. Carter said the therapy was ordered after Mother stormed out of court hearing earlier in this case. Carter explained that there had been tension between Grandmother and Mother during the entire case and that Grandmother originally did not want to participate in the therapy. Carter testified that Mother was now willing to participate.

Carter does not believe Mother can provide a safe and stable environment for her children. Carter testified that the therapist who worked with Mother and Father stated there was not much she could do with them because they denied any domestic violence concerns and planned to remain together. According to Carter, the children reported there is a lot of arguing and some domestic violence between their parents. Carter also testified that Mother continues to demonstrate a strong sense of loyalty to Father.

Carter said he believes that even though Mother was successfully discharged, she needs to continue receiving individual therapy. Carter reported Mother continues to deny Father acted inappropriately with Mindy. Carter agreed that Mother extends empathy to Father, but not to her daughter Mindy.

Carter testified that Mindy did not request visits with Mother at one time, but she continued voluntarily visiting Mother. Carter reported that Mindy was doing well in her placement with her grandparents and also in school. According to Carter, Mindy indicated that she is willing to go home if Father is not allowed back in the home. Mindy told Carter that she does not want Father around her or

her friends.

Carter then testified about Mitch, who was nine at the time of trial. According to Carter, Mitch is doing well, he is passing his school classes, and is also in therapy. Carter testified that Mitch informed him that he would be willing to go home to Mother if Father was not around or in the home. During his testimony Carter explained that when he asked Mitch whether he wanted to stay with his grandparents or live with Mother, Mitch stated he wants to stay with his grandparents. According to Carter, Mitch mentioned domestic violence in the home, Mother attempting suicide, and an incident during which Mitch said there were knives all over the floor and he was afraid Father would stab someone. When asked about more visitation time with Mother in the future, Mitch's biggest concern was missing his after-school art program. According to Carter, Mitch did not express an interest in spending more time with Mother.

Carter testified that the two youngest children, Max and Fran, go to daycare where they are doing well. Carter further testified that none of the children have special needs.

According to Carter, Mother and Father are married. Carter stated he believes the relationship is not over between Mother and Father. Carter testified that he believes Mother and Father are still living together but he admitted he did not have physical proof. Carter testified that Grandmother and the children have told him they think Father is still living with Mother.

Carter testified the Department believes Mother should continue to have visitations rights with the children. He also testified Mother's visitations should be "supervised at all times."

**Grandmother**

Grandmother is the maternal grandmother of the four children. Grandmother and her husband, C. L., intervened in the litigation. Grandmother testified the children have been in her care and that she and her husband intervened to ensure they had appropriate rights to the children. Grandmother testified that, at the beginning of the case, she and her husband thought they would be a temporary placement for the children until Mother "got right." Grandmother said that Mother promised they would get through this situation together, without Father. According to Grandmother, Mother then decided not to do that. Grandmother said they found out Father was living with Mother again and they were back together. Grandmother testified Mother was telling them that she was not with Father, "but she was." Grandmother testified that she has seen Father with Mother while this case was pending. Grandmother said the last time she saw them together was late the previous year.

Grandmother explained that Mother has five total children. She testified Ferdinand is Mother's oldest son and is now an adult. Grandmother testified Father has two other daughters who live with their grandparents and Father has no rights to them. Grandmother said that Department investigations of Mother and Father started when Ferdinand was young. Grandmother described most of these early investigations as over "stupid stuff." Grandmother said she noticed problems developed just before Fran, the second-youngest child, was born. When asked if she noticed at that time any "oddness" in Father's behavior, Grandmother responded that she did. According to Grandmother, this behavior included Father "talking in tongues." Grandmother also stated that Father would wake up during the night and tell Mother that her parents did not love her and wanted her dead. Grandmother testified that there are videos of this behavior taken by Mother and sent to Mother's parents. Grandmother said that Mother initially insisted that she

9

could handle Father's behavior, but then Fran was born with drugs in her system. Grandmother said that she had no idea Mother was using illegal drugs.

Grandmother testified she hopes that her relationship with Mother will improve. Grandmother does not think Mother is completely rehabilitated, despite completing counseling. Grandmother thinks Mother can continue to improve if she takes the offered Department services seriously. Grandmother asked the trial court to order supervised visitations for Mother because Mother continues to do what Father tells her to do. Grandmother also expressed concern that Mother and Father would disappear with the children if Mother was allowed unsupervised visitation. Grandmother was also concerned about Mother's mental state. Grandmother testified that she and Grandfather have discussed supervising visits between Mother and her children in their own home, but she did not think it would be a good idea because Mother does not like their rules. Grandmother also testified that Mother can "run over [us] like a bulldozer." Grandmother explained that she and her husband would like to get to a point where they could supervise visitations but it was not possible at that time because Mother "seems to hate [them] so much right now." When asked whether her oldest grandchild, Ferdinand, could handle the supervised visits, Grandmother testified that she did not believe so because Ferdinand blames the grandparents for what has happened. Grandmother also stated that Ferdinand is away in college trying to get his own life together.

According to Grandmother, Mother agreed to provide $200 a month to the grandparents for the children. Grandmother went on that Mother is behind on those agreed payments. Grandmother also testified about conversations she has had with Mindy, her oldest granddaughter. According to Grandmother, Mindy expressed "fear about things going back to the way they were because there was

abuse towards the kids too." Mindy told Grandmother about Mother yelling at Fran, her youngest daughter, and blaming her for the fighting between the parents. Mindy also told Grandmother that Mother hit Mitch, the middle grandson, all the time.

Grandmother said that Mother threatened suicide "thousands of times." Grandmother agreed that Mother's first attempt occurred when Mother was 17. During this attempt Mother swallowed pills. Grandmother was also aware of an incident in 2019 when Mother took twenty Xanax pills attempting to commit suicide. Grandmother explained this attempt was in reaction to Father accusing Mother of having an affair. Grandmother said Father's accusation came out of his belief that Fran was not his child. Grandmother continued that Mother told her that a DNA test had been done and it established that Fran was Father's child.

Grandmother testified that she and her husband were not contacted by the Department when the Department investigated Mother about allegations that she was physically neglecting Ferdinand when he was younger. According to Grandmother, Mother did not engage in services with the Department during these earlier investigations. Grandmother testified that Mother did not start services with the Department until the four younger children were taken into Department custody. Grandmother testified that the first time they were contacted by the Department about being a placement for the four children did not occur until 2022.

**Mother**

Mother testified during the trial as well. Mother was initially asked about the fire that burned the family's home down.[1] Mother explained that the fire department said the fire was caused by faulty wiring. Mother explained that, at the

---

[1] The house fire occurred in June of 2022.

11

time of the fire, Ferdinand and Fran were living with Grandmother. According to Mother, they continued to live at Grandmother's after the fire. Mother admitted that she and Father were out of the house when the fire occurred and that they had left three children under the age of 10 in the house. Mother testified that, after the fire, she, Father, Mindy, Mitch, and Max went to live in a hotel. Mother testified it was after the house fire that she first noticed Father was having serious mental health issues.

Mother was then asked what she "would like to see from this case?" Mother responded that she just wanted "her kids home with me and me alone." This in turn led to questions about Father's status. Mother was asked if that meant Father would not be part of her family anymore. Mother answered: "For right now until this case is decided." Mother continued that, from there, it depends on whether Father gets the mental health help he needs and if the children want to see him. Mother said contact with Father is not up to her. Mother said that Father's mental health issues are all related to post-traumatic stress. Mother said that Father is working on his mental health. Mother also testified that Father has told Mother that he will provide for his family. Mother said "he gives me money." Mother continued that was "all I need him for right now."

Mother was then asked about what type of access she would like if the children are not returned to her. Mother responded that she would like unsupervised access to the children. Mother testified that it would be nice to visit with the oldest children separately from the younger children because the older children do not like the attention being taken from them by their younger siblings.

The questioning then turned to Mother's employment situation. Mother explained that she sought employment because "CPS told us to separate." Mother stated that she is a retail manager at Claire's and she also works part-time at Build-

a-Bear. Mother testified that she has become friends with her manager at Claire's and that her manager can supervise visits between Mother and her children.

Mother testified that she did have postpartum depression and a thyroid disorder when she spoke to a caseworker earlier in the year. Mother stated that she experiences anxiety and depression, and she has a thyroid condition. She continued that she takes medication for all three conditions.

During the trial Mother testified that Max did go underwater while they were living in a hotel room after their house burned. Mother stated that Father was bathing Max while she was on the toilet. Mother testified that she reacted faster than Father and grabbed Max first. Mother testified that Mindy also saw Max go underwater. Mother explained that Mindy described Father as "zoned out." (ID) Mother denied that Father had "zoned out" during the incident and denied that she had told an investigator that Father had "zoned out." Mother, however, had previously reported that Father "zoned out" while Max was in the bathtub and he went underwater. In her earlier description of the incident, Mother reported that she heard Max coughing and she went into the bathroom where Father admitted that he "zoned out."

Mother denied Father had been picked up on a mental health warrant. Mother testified that one of Father's massage clients was concerned because Father "was talking a lot about God and Jesus." Mother denied that she told the caseworker that Father thought he was God. Mother testified that while Father did not think he was God, he did believe that God talked to him. Mother continued that she has always known that he did not need to be alone with the children but said she did not know how dire his mental health was until his criminal attorney informed her that Father was incapable of standing trial. Mother admitted she thought Father was incompetent during Covid. Mother testified that she and Father

13

owned a massage business. Mother continued that when the Department told her she and Father needed "to split," Father started working for Dollar Tree.

Mother denied she told the Department's caseworker that she was suicidal but "did not have a plan." Mother explained that she told her therapist she used the words she did because she did not have a better way to express her frustration. Mother testified that sometimes she gets frustrated and she "want[s] to disappear." Mother continued that her therapist said that "sounds like suicidal tendencies" and told Mother she needed to watch how she says "those things." Mother did admit that she swallowed pills when she was seventeen. Mother denied swallowing pills in 2019. Mother said she did take old medication that she had for anxiety so she could sleep during a rough pregnancy. Mother denied this incident was a suicide attempt.

The trial judge asked Mother about Father's statement that Mother had tried to cut herself with a knife in 2019. Mother denied this incident occurred. Mother did acknowledge that she texted her mother, Grandmother, about committing suicide many times.

Mother was asked about the allegation that she shook Ferdinand, her oldest son, and had a filthy apartment. Mother denied ever shaking Ferdinand. Mother testified that she was informed the investigation "was cleared up." Mother admitted that after Ferdinand was born she did have a hard time keeping her home clean and managing being a mother by herself. Mother testified it was at this time that she left Texas and moved to Florida where she lived with an aunt. Mother moved when Ferdinand was around six months old and she remained in Florida for about three years.

Mother testified that she met Father after she moved back to Texas. According to Mother, this would have been about 2009. The trial judge then asked

14

Mother about allegations that she and Father had heated arguments and engaged in domestic violence. Mother admitted that she was not "proud of it," but the allegations were "slightly true." Mother explained that she and Father argued a great deal during the Covid pandemic lockdowns. Mother said that she was trying to manage the children by herself and Father was not able to earn an income as a masseuse. Mother admitted they yelled a lot. Mother did not deny having bruises on her eyes and legs but said that she bruises easily and has random bruises without explanation. Mother agreed that she told the caseworker she attacked Father and Father headbutted her. Mother said this incident occurred after Fran was born.

Mother testified Father has been charged with sexual assault of a massage client. Mother testified there is not a trial date because Father is "not doing good mentally right now." Father's attorney calls Mother to make certain Father gets to court on time. When this happens, Mother messages Father to remind him and she also helps him figure out how to get to court because Father does not have a car. Mother continued that Father walks to work unless he calls her to pick him up, a friend loans him a car, or Mother buys him an Uber.

Mother admitted that she relies on Father to provide her $2,000 a month. When the trial judge asked Mother what her back-up plan was if Father goes to jail, Mother responded that she has two potential roommates so long as Grandmother agrees to not have the roommates followed. Mother further testified that she was able to obtain a lease in her name. Mother testified that she currently lives alone because her friend is too scared to move in.

Mother was then asked about concerns she has over the grandparents being named primary conservators of the children. Mother testified that she is concerned Grandmother will move to Maine with the children if she is named a primary

conservator. Mother also expressed concern that the grandparents would not treat Mitch's ADHD properly because they "don't acknowledge [his] ADHD in full." Mother stated that Grandmother told her Mitch's ADHD is "not extreme enough" to be considered and believes "we need to get back to punishing them the way we used to back in the old times." Mother said the grandparents do not punish Mitch correctly as a result of this belief.

The questioning then turned back to Father's status. When asked if she was able to keep Father "out of the picture in [her] household" Mother responded that she could. Mother also testified that she was not aware of any efforts by Father to see the children during the course of the case. She also testified that Father had never shown up at any of her supervised visits with the children and had never asked about when the visits would occur. Mother admitted she needed to be protective of her children when it came to Father. She also testified that she believed she could be protective of her children against Father. Mother explained that she understood Father was "not in the right head space right now" and she was not certain how he would do around the youngest child because Father did not do well with babies.

Mother said she would like to work on her relationship with Mindy during therapy. Mother said therapy was not successful the first time because she would speak over Mindy and also because Mitch was present.

Mother testified that Ferdinand attends college in Corpus Christi. Mother testified that she supports him to the extent she can by providing money when he needs it. Mother explained that this could be $20 or it could be $250. Mother testified that her monthly income is $2,000. When asked what she would do if she did not have the money Ferdinand needed, Mother answered that she would take it from Father's bank account. Mother explained that she still has access to the joint

account with Father.

Attention then turned to Father's children from a prior marriage. Regarding Father's other children, Mother stated she was with Father when he went to court in those Department cases. Mother did not recall being present when a protective order was issued against Father during those cases.

Next Mother was questioned about Mindy's sexual abuse allegations against Father. Mother testified she first heard about the allegations when her visits were stopped. Mother said she was concerned about the allegations until Mindy told her it was not true. Mother continued that she was also not concerned because the children were always with her or on cameras in the house. Mother continued that Mindy made the abuse allegations after she had been placed with her grandparents and after the grandparents could talk to her about "things that they should be saying to keep themselves together." Mother testified that she had cameras all over her home and the children were never outside the view of the cameras. In later testimony, Mother said she did not leave her children alone with Father after the house fire.

**Delilah Dupree**

Delilah Dupree served as the court-appointed child advocate and guardian ad litem for the children. Dupree had worked on the case almost since its inception. Dupree recommended that the grandparents be named permanent managing conservators. Dupree also recommended supervised visitation for Mother and no visitation for Father. Dupree said her recommendations were based on the requests of the children. Dupree testified the children reported not feeling safe with either parent. Dupree said the children have all made progress while living with the grandparents. She additionally testified that all of the children had some level of delay in their education or had mental health concerns that have been

addressed by their grandparents.

Dupree testified that Mother's mental health continues to go untreated. According to Dupree, Mother cannot provide a safe place for her children because she remains unprotective when Father is involved. Dupree continued that the grandparents have demonstrated they are capable of providing a safe and stable place for the children.

Dupree further testified that the children do want supervised contact with Mother. The children have told Dupree however, that they do not believe Mother will protect them from Father. The children have also talked about the multiple times they feared Mother would commit suicide.

Dupree next testified that the parents were jointly ordered to pay $200 a month for child support. Dupree reported that the support was paid most months.

Dupree's Court Report was admitted into evidence as Petitioner's Exhibit 9. In her report, Dupree recommended that the maternal grandparents be designated permanent managing conservators of the children.

**Angelica Glennon**

Glennon identified herself as Mother's friend and boss at Claire's. Glennon testified she has known Mother for about a year and a half. Glennon said that she has interacted with the children two or three times. Glennon said she is willing to supervise visits between Mother and the children. Glennon testified that she allows Mother to borrow one of her cars when Mother needs one. Glennon admitted that she has a CPS history because she was involved with a partner who had drug issues. Glennon said they completed services. Glennon testified that her partner has been sober for eight years.

Glennon has met Father a couple of times. Glennon thinks Father needs "a

little bit of therapy and a little bit of help." According to Glennon, Mother has told her that she does not believe in divorce, but Father should not be around the children. Glennon continued that Mother's biggest concern is keeping Father separate from his children because Mother does not think it is a good idea for him to be around the children. Mother did tell Glennon about Father's case regarding his children from a prior marriage. According to Glennon, Father's rights had been terminated and he has not had contact with them since Mother and Father have been together. According to Glennon, Mother explained that Father had defended himself against his ex-wife and that the ex-wife had mental illness issues. Finally, Glennon testified that it would not be in the children's best interest for Mother to have a continuing relationship with Father.

**Ferdinand**

Ferdinand is Mother's oldest son. Ferdinand has a different father than the four children involved in this suit. Ferdinand described his relationship with his half-siblings as close. Ferdinand said that he texts with Mindy, although sometimes she will call so he can speak with his other siblings. Ferdinand said he is closest to Fran. Ferdinand reported that he feels comfortable and safe in Mother's new home. According to Ferdinand, his stepfather, Father, has come to the house a couple of times when he has been there. Ferdinand explained that Father usually comes over between shifts at Dollar Tree. Ferdinand further testified that his stepfather will sleep in a spare room when he works a late shift at the Dollar Tree with an early shift the next day.

Ferdinand believes that his siblings do not want to see Father. Ferdinand said he can supervise visits when he is home from school. Ferdinand stated he had also lived with his grandparents. Ferdinand said he moved in with his grandparents after an argument with his Mother and stepfather around semester

19

finals. Ferdinand and Fran were living with the grandparents when the house burned down.

Ferdinand had concerns about how Father treated his mother. Ferdinand testified that he did not have concerns about how Father treated the children. Ferdinand said the relationship benefits Mother financially but he does not feel that the parents' relationship is a good model for the children.

Ferdinand testified that he never saw any domestic violence between Mother and Father. Instead, he testified that Mother would harm herself in places where Ferdinand and the other children would see it happen. Ferdinand said he witnessed Mother's suicide attempts. Ferdinand did admit however, that there were loud arguments between Mother and Father. Ferdinand testified Mother has become more independent from Father since she started working. Ferdinand thinks that the Department services have been beneficial.

The court signed its Final Decree in Suit Affecting the Parent-Child Relationship on May 16, 2024. The decree did not terminate the parent-child relationship of Mother. The trial court found that it would not be in the best interest of the children to appoint a parent as managing conservator because doing so "would significantly impair the children's physical health or emotional development." The trial court did name Mother as a possessory conservator with restricted rights.[2] The maternal grandparents were named joint managing conservators of the children. Mother appealed.

## ANALYSIS

Mother raises two issues on appeal. We address them in order.

---

[2] The trial court did not appoint Father as a managing or possessory conservator of the children. Father is not a party to this appeal.

20

**I.** **The trial court did not abuse its discretion when it appointed the maternal grandparents joint managing conservators of the children.**

In her first issue, Mother argues the trial court abused its discretion when it appointed the maternal grandparents joint managing conservators of the children because there was legally and factually insufficient evidence to overcome the statutory parental presumption. *See* Tex. Fam. Code § 151.131 (creating rebuttable presumption that parent shall be appointed sole or joint managing conservators of children). Because there is sufficient evidence in the record supporting the trial court's determination that appointment of Mother as a managing conservator would not be in the children's best interest because the appointment would significantly impair their physical health or emotional development, we disagree.

**A.** **Standard of review and applicable law**

The best interest of a child is always the primary consideration of the court in determining issues of conservatorship. *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (citing Tex. Fam. Code § 153.002). A parent must be appointed a managing conservator of a child unless the court finds that appointment of the parent "would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." Tex. Fam. Code § 153.131(a).

We review conservatorship determinations for an abuse of discretion. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Baltzer v. Medina*, 240 S.W.3d 469, 474–75 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Generally, a trial court abuses its discretion by acting arbitrarily, unreasonably, or without reference to any guiding rules or principles. *See Swaab v. Swaab*, 282 S.W.3d 519, 524 (Tex. App.—Houston [14th Dist.] 2008, pet dism'd w.o.j.). We cannot interfere with the trial court's ruling so long as there is some evidence of a substantive and probative

21

character to support its decision. *See Cox v. Cox*, No. 14-22-00853-CV, 2023 WL 6561106, at *4 (Tex. App.—Houston [14th Dist.] Oct. 10, 2023, no pet.) (mem. op.). A trial court's finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance-of-the-evidence standard. *In re J.A.J.*, 243 S.W.3d at 616.

Under this abuse-of-discretion standard, legal and factual sufficiency are not independent grounds of error, but instead are relevant factors to determine if the trial court abused its discretion. *See Baltzer*, 240 S.W.3d at 475; *see also Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991). When examining legal sufficiency, we review the entire record, considering evidence favorable to the finding if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). We indulge every reasonable inference that would support the challenged finding. *Id*. Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the decision under review. *Id*.

For a factual-sufficiency review, we examine the entire record and consider evidence favorable and contrary to the challenged finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). We may set aside the trial court's finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id*.

"As conservatorship determinations are 'intensely fact driven,' the trial court is in the best position to 'observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record.'" *In re J.J.R.S.*, 627 S.W.3d at 218 (quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002)). As a result, an appellate court defers to a

trial court's resolution of underlying facts and credibility determinations that may have affected the trial court's decision and will not substitute its judgment for that of the trial court. *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992).

### B. Sufficient evidence supports the trial court's decision to appoint the grandparents as joint managing conservators and Mother as a possessory conservator of the children.

On appeal, Mother argues that the trial court abused its discretion because it made its conservatorship decision (1) based on speculation and conjecture about Father's potential involvement with the children if they were returned to Mother's care; and (2) without evidence showing a specific threat that the children would suffer emotional or physical harm if they were returned to her care. Mother also points out evidence in the record she argues indicates that she had worked diligently to be reunited with her children, had become more independent and self-reliant, and had improved her mental health condition after the Department got involved with her children. In making this argument, Mother minimizes other evidence in the record supporting the trial court's decision and she also overstates the requirement for evidence of specific actions or omissions that would significantly impair the children's physical health or emotional development. *See Danet v. Bhan*, 436 S.W.3d 793, 797, n.1 (Tex. 2104) (noting Family Code section 151.131 does not require evidence of specific actions or omissions). With that preamble, we turn to the record evidence.

The record includes evidence establishing that Father was suffering serious mental health issues. This evidence includes Mother informing the Department that a mental health warrant had been issued for Father, but he was released due to a lack of available beds. Mother also reported that Father had "zoned out" while Max was in the bathtub allowing Max to slip under the water. Mother reported that Father claimed he was God and was constantly saying crazy things. Mother

23

reported that, because of Father's behavior, she had to drop him off at the family's burnt-out home to get a break from him. Faced with these reports, the Department had proposed a safety plan that would prevent removal of the children. This plan required Father to move out of the house. Mother refused to have Father leave, which prompted the removal of the children.

During the trial, as detailed in the Background section above, Mother largely retracted her previously reported concerns about Father's mental health. Despite these retractions, Mother testified during the trial that she had always known that Father should not be alone with the children. The trial court, as the trier of fact, was allowed to disregard Mother's retractions and believe her original reports about Father. *Qantel Bus. Sys., Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 304 (Tex. 1988) (stating that in a bench trial the trial court sits as the trier of fact and law); *Arshad v. Am. Express Bank, FSB*, 580 S.W.3d 798, 803–04 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("The factfinder is the only judge of witness credibility and the weight to give to testimony."). The trial court also heard Mother testify that she accepted that Father could not be part of the family "for right now until this case is decided." Thus, the trial court could have reasonably determined that Mother was not willing or able to protect the children from Father's behavior because she would allow him back into the home as soon as the Department was no longer involved. *See Arshad*, 580 S.W.3d at 803–04.

There was also other evidence in the record establishing that Father continued to suffer from mental health issues and should not have access to the children. This includes Carter's testimony about his Dollar Tree parking lot meeting with Father. Carter testified that, during this meeting, Father acted strangely, and Carter did not believe Father was rational or properly medicated.

There is also evidence in the record that sexual assault allegations had been

24

made against Father over a long period of time. These included an allegation that Father sexually assaulted his baby daughter by his first wife in 2007. Mindy also alleged that Father sexually assaulted her, but she later recanted her allegation. The Department, however, believed Mindy's original statement. Finally, one of Father's massage clients accused him of sexual assault. That charge was pending at the time of this trial. Mother denied Father acted inappropriately with Mindy even though, as mentioned above, she testified that she would not leave the children alone with Father. Again, based on this evidence, the trial court could have reasonably concluded that Father presented a threat to the children's physical health and emotional development and that Mother was not willing, or able, to protect the children from Father.

Turning to Mother, there is evidence in the record that she also experienced mental health problems during which she would retreat into her room all day leaving Mindy to care for the younger children. In addition, Fran swallowed magnets while under Mother's care. Fran had to be hospitalized and Mother failed to bring Fran back for a follow-up medical appointment after that hospitalization. There were numerous reports throughout the record that Mother frequently had suicidal thoughts. In addition, Ferdinand testified that he witnessed Mother's suicide attempts and that she would harm herself in front of the other children.

While Mother cites to evidence, such as an April 19, 2023, discharge summary, stating that her mental health had improved, her mental health problems continued throughout 2023, prompting a new psychological evaluation on January 10, 2024. As stated in this exhibit, Mother successfully completed this therapy, but the goal of the therapy was to give Mother the skills to take care of herself and self-manage her emotions without the assistance of therapy. The discharge summary does not contain an opinion by the clinician that Mother's mental health

issues had been successfully resolved nor that the clinician believed Mother was ready for the return of her children. Based on this and other evidence in the record summarized above, the trial court could have reasonably determined that Mother continued to experience mental health issues that directly impacted her ability to care for the children.

The record also contains evidence of long-running domestic violence concerns involving Father and Mother. Father admitted that a restraining order had been put in place which prohibited him from having any contact with his children from his previous marriage. Father also admitted that his ex-wife reported that he "pushed her around," but he explained that he was only responding to his ex-wife's aggression.

Both Mother and Father denied that domestic violence had occurred in their home. Despite their denials, there was a referral for domestic violence on November 12, 2019. Mother was seen by Department investigators at that time. According to the investigators, Mother had bruising around her eyes and on her legs. Mother told the investigators that Father had "headbutted" her. Father, on the other hand, stated that Mother hit herself. During the trial, Mother agreed that she told the Department investigator that she attacked Father and that Father then headbutted her. Mother testified that she bruises easily and without explanation. Despite this, Mother still denied the existence of domestic violence.

Despite Mother's denial, the children disclosed the existence of domestic violence in the home. Mindy receives therapy to help her process the domestic violence she witnessed. Grandmother testified that Mitch told her about Mother frequently hitting and slapping him. Mitch has stated domestic violence in the home is one reason he wants to stay with his grandparents rather than return to his Mother's care. Mitch also reported an incident when there were knives all over the

floor and he was afraid that Father was going to stab someone.

Based on the evidence in the record, the trial court could have reasonably determined that the services extended by the Department to help the parents have not been successful in alleviating the concern of domestic violence in the home. The couples' therapist reported that she could not make progress with the parents because they denied the existence of any domestic violence in their home. The therapist said the parents are "locked in step" and intend to stay together "functioning as they know how." Finally, Father has not completed any domestic violence services or individual therapy.

By the time of trial, the parents remained married. The Department, the grandparents, and the children all believed that the parents were living together. Grandmother testified that she saw the parents together during the case in late 2023, despite Mother's statements that she and Father were not together. Finally, Ferdinand testified Father routinely stays in Mother's new home.

Based on this evidence, the trial court, as the factfinder, could have reasonably determined that Father presented a threat to the children's physical health and emotional development and determined that it was not in the children's best interest to appoint him as a conservator. In addition, based on this evidence, the trial court could have reasonably believed that Mother would allow Father in the home and, based on her current denials and own unalleviated nonprotective behaviors, that Mother would not protect the children from Father or from her own tendencies, and it was therefore not in the children's best interest to appoint Mother as a managing conservator of the children.

Similarly, sufficient evidence supports the trial court's appointment of the grandparents as joint managing conservators of the children. In addition to the evidence recounted above, both the caseworker and the guardian ad litem of the

children testified that it was in the children's best interest to remain with the grandparents and not return to Mother's home. Carter testified that the children were doing well living with the grandparents. He stated that Mindy is receiving needed therapy, Mitch is doing okay in school, and he is in group therapy to help him process the domestic violence he observed in his parents' home. Carter further testified that Max and Fran are both in daycare where they are doing well and have no special needs.

In addition, Dupree, the children's guardian ad litem, testified that all of the children entered the Department's care with some kind of delay or mental health concerns. In her report, Dupree stated that the grandparents are meeting all of the children's needs and they keep up with all of their appointments. Dupree further stated in her report that the placement of the children with the grandparents ensures that every available resource is being used to ensure their mental health and educational needs are met. Dupree also testified that the grandparents "have demonstrated that they are capable of providing a safe and stable place for all of the children."

We hold that the trial court did not abuse its discretion because legally and factually sufficient evidence supports the trial court's conservatorship decision was in the children's best interest. We overrule Mother's first issue on appeal.

## II. The trial court did not abuse its discretion when it limited Mother's right to possession and access to the children.

In its Final Decree, the trial court appointed Mother to be a possessory conservator of the children. The trial court also ordered that Mother "shall have supervised possession of the children at times mutually agreed to in advance by the parties and supervised by a competent adult of the Managing Conservators choice." Finally, the trial court ordered that if the parties could not agree, the

28

Mother's possession and access would occur on the first and third Saturdays of each month for two hours. The trial court also ordered that the visits would be supervised by the Domestic Relations Office Supervised Visitation Program. The trial court found that this appointment and the possession and access restrictions imposed did not exceed the restrictions needed to protect the best interest of the children. In her second issue, Mother argues that the trial court abused its discretion when it placed arbitrary and unreasonable restrictions on her right to possession and access to the children. We once again disagree.

Trial court decisions about possession and access are reviewed for an abuse of discretion. *In re J.J.R.S.*, 627 S.W.3d at 223. The Family Code permits a restriction or limitation to the extent necessary to protect the children's best interest. *See* Tex. Fam. Code §153.193; *In re Harrison*, 557 S.W.3d 99, 131 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("A trial court does not abuse its discretion in restricting a parent's possession and access when the record contains evidence to support a finding that such restrictions are in the children's best interest."). Termination is not required when a severe restriction or limitation on access can also be in the best interest of the child. *In re J.J.R.S.*, 627 S.W.3d at 223. The restriction preserves the possibility that the parent and child may continue to have a relationship in the future. *Id.* So long as the trial court made the necessary findings that the restriction or limitation is in the children's best interest, the terms of the order are permissible. *Id.*

There is a rebuttable presumption that the standard possession order provides the reasonable minimum level of possession and access for a parent named possessory conservator and is in the best interest of the child. Tex. Fam. Code. § 153.252. When determining whether to deviate from the standard possession order, a trial court may consider "(1) the age, developmental status,

29

circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named as a possessory conservator; and (3) any other relevant factor." *Id.* § 153.256. Terms of an order that deviates from the standard possession order "may not exceed those that are required to protect the best interest of the child." *Id.* § 153.193. Further, the trial court must "specify and expressly state in the order the times and conditions for possession of or access to the child, unless a party shows good cause why specific orders would not be in the best interest of the child." *Id.* § 153.006(c).

Nonspecific orders issued pursuant to section 153.006(c) can vary, based on the needs of the case, as to the level of specificity provided by the trial court, and the amount of discretion left to the parties. *See id.* § 153.193. Nonspecific orders are permitted in circumstances where such are necessary to protect a child's best interest. *In re J.J.R.S.*, 627 S.W.3d at 221. Whether broad, enforceable visitation and access guidelines is preferable to an order allowing discretion to the managing conservators requires a case-by-case determination of the child's best interest. *Id.* at 222.

In addition to the endangerment evidence rebutting the parental presumption and the best interest evidence supporting the appointment of the grandparents as managing conservators of the children, there is additional evidence to support the trial court's restriction of Mother's visitation and access to the children instead of applying a standard possession order to this case. Despite Mother's statement otherwise the children able to voice their opinion, Mindy and Mitch, only want supervised visitation with Mother. Despite all the instability and endangering conduct, Mother can visit with the children when supervised. Mitch and Mindy expressed concern about Mother giving Father access to them and about Mother's suicide attempts. The trial court could have reasonably concluded that continuing

supervised visits and restricting the timeframe, absent a mutual agreement otherwise, would provide the safest environment for the children and that good cause for deviating from the standard possession order existed. *See In re J.J.R.S.*, 627 S.W.3d at 220 (observing that severe restrictions are permissible if it is in the best interest of the children.).

Mother complains that the visitation and access ordered by the trial court undermines her ability to maintain a meaningful and nurturing relationship with her children. We disagree. The appointment of a relative as a managing conservator and a parent as a possessory conservator with access and visitation rights, no matter how restricted, avoids the termination of that parent's parental rights. The Texas Supreme Court stated:

> Requiring termination of parental rights rather than a conservatorship with severe access restrictions would place trial courts in an unimaginable bind. Such a harsh rule would force a trial court to either allow access to a child by a possessory conservator who may immediately endanger that child's physical or emotional wellbeing, or conversely, force the trial court to prematurely sever the parent–child relationship out of fear that immediate access may cause irreparable harm to the child. Such a proposition is antithetical to the purpose of visitation orders, which strive to balance the rights of parents with the importance of protecting children.

*Id.* at 222; *see* Tex. Fam. Code §153.001(a). The trial court in this case could reasonably have seen these restrictions as in the best interest of the children and a step short of termination, allowing for flexibility if Mother is able to safely visit and have access in a less restrictive way. The children can stay in a home with their grandparents where their needs are met and Mindy and Mitch's safety concerns and wishes about visitation are honored.

Mother also objects to the part of the trial court's decree allowing the grandparents to choose the visitation monitor. Mother argues that the monitors

31

she offered should have been accepted by the trial court. The first monitor offered by Mother was her supervisor at Claire's, Angelica Glennon. Glennon testified that she had only known Mother for a year and a half, thought that Father needed only "a little bit of help," and had been informed by Mother that Father lost his other children because he defended himself against a mentally-ill wife. Glennon also had CPS history herself. The trial court could have reasonably concluded that Glennon did not have sufficient facts to be in the best position to protect the children and may not be safe herself based on the CPS history.

Mother's second proposed monitor was her oldest son, Ferdinand. Ferdinand testified that he was attending college in Corpus Christi and could only monitor the visits when he returned home. The trial court could have reasonably determined that Ferdinand lacked the regular availability to fulfill any supervisory duties if he was appointed the adult responsible for supervising Mother's visitation with the children. In addition, nothing in the trial court's decree prohibits the grandparents from choosing Ferdinand as the monitor when he is in town and available.

Finally, Mother argues that the strain in the relationship between Mother and the grandparents makes the trial court's decree unworkable. Mother asserts that it is "questionable" whether the grandparents will be fair when making the arrangements necessary for Mother's visitations to occur. The scenario presented by Mother is remarkably similar to the argument raised by the mother in *In re J.J.R.S.*. 627 S.W.3d at 223. There the mother argued that she had no recourse if the managing conservator arbitrarily withheld access because the orders allowed for discretion. *Id.* The Texas Supreme Court said that there were remedies available to the mother if this occurred. *Id.* These included filing a contempt action for disobeying a court order or seeking a modification order if the

circumstances had materially or substantially changed. *Id.* At this stage, Mother has pointed to no evidence in the record indicating that the grandparents would arbitrarily deny Mother access to the children. If, in the future, they do, Mother is not without a remedy. *Id.* at 224.

We conclude that the trial court did not abuse its discretion when it appointed Mother to be a possessory conservator and limited her to supervised visits at the discretion of the managing conservators because sufficient evidence supports its determination that this was in the best interest of the children. It also allows for flexibility should the circumstances change to allow greater access and visitation for Mother without the necessity of court intervention. We overrule Mother's second issue.

## CONCLUSION

Having overruled Mother's issues on appeal, we affirm the trial court's judgment.

/s/    Jerry Zimmerer
       Justice

Panel consists of Justices Jewell, Bourliot, and Zimmerer.