# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00455-CV

---

**Quinn Hamilton Harwood, Appellant**

**v.**

**Kimberley Anne Harwood, Appellee**

---

**FROM THE COUNTY COURT AT LAW NO. 4 OF WILLIAMSON COUNTY
NO. 19-3939-FC4, THE HONORABLE GARY HARGER, JUDGE PRESIDING**

---

## O P I N I O N

Quinn Hamilton Harwood appeals the trial court's final divorce decree. He contends that the trial court abused its discretion by awarding spousal maintenance to his ex-wife, Kimberley Anne Harwood, and by relying on a finding of his intentional underemployment in calculating the spousal-maintenance amount.[1] For the following reasons, we affirm the trial court's determination that Kimberly is eligible for spousal maintenance but conclude that the trial court abused its discretion in calculating the amount of the spousal-maintenance award, reverse that award, and remand this case for a new trial on that issue.

---

[1] We will refer to the parties by their first names because of their shared surname.

## BACKGROUND

Quinn and Kimberley married in 1998 and separated over 20 years later in 2019. Their three children were between ages 16 and 21 at the time of trial. Quinn filed for divorce on the ground of insupportability. Kimberley's counterpetition alleged cruel treatment and insupportability grounds for divorce and requested, among other things, an award of spousal maintenance. The case was tried to a jury, which found only the insupportability ground for the divorce. This was followed by a bench trial on the remaining nonjury issues, including Kimberley's spousal-maintenance request.

Kimberley testified that she was diagnosed in 1990 with secondary lymphedema of her right leg, which retains 20 to 30 pounds of fluid and causes swelling. The swelling and retraction cause breaks in the skin and resulted in her getting several infections. Heat and humidity exacerbate her lymphedema. As a teenager, Kimberley had lymph-transplant surgery to address her left-leg swelling, which stopped for many years afterward. But in the year before trial, her situation "deteriorated," and her left leg began swelling like her right leg. She manages her condition by wearing four compression stockings, taking salt baths, and keeping her legs elevated as much as possible. Photos comparing her right leg, ankle, and foot when swollen and in their more normal condition were presented to the jury.

Due to her lymphedema, Kimberley began receiving social security disability payments in 2003. At the time of trial, she was receiving monthly disability payments of $1,900, with $337 of that amount related to the two younger children, who live with her. Kimberley has a Bachelor of Science degree from the University of Southern California. Between 1999 and 2002, she worked with Chanel in Los Angeles as an account executive, a counter manager, and part-time behind the counter, but she has not been employed since 2002. She denied being able

2

to get a job and work full-time. She requested an award of spousal maintenance for an indefinite period, in an amount based on 20 percent of Quinn's gross income. She provided an exhibit with her budget, listing income and minimum reasonable needs. She listed monthly income of $6,172. This consists of $1,972 in disability benefits, $1,200 in child support, and $3,000 in loaned funds from her parents.[2] She also listed $9,956.50 in itemized monthly expenses for herself and the children. This consists of $3,009 for mortgage, utilities, phone, and cable; $2,220 for groceries, household supplies, and meals away from home; $300 for clothing; $2,053.79 for medical, vision, and mental-health care expenses; $1,101 for vehicle maintenance, insurance, and gas; $300 for school tuition, supplies, and children's activities; and $972.71 for incidentals such as haircuts, team sports fees and travel, dues and subscriptions, veterinary bills, and gifts for birthdays and holidays.[3]

Quinn testified that Kimberley receives disability benefits for her "lymphedemic leg," which causes swelling, aches, and pains that negatively impact her life and affect her daily. He acknowledged that Kimberley had been hospitalized and has sustained six or seven different infections due to her lymphedema. But he argued that she leads an active life and "pushes through a lot of things" despite her condition.

Quinn has a Bachelor of Science degree from Davidson College. In the early years of the marriage, from 1998 to 1999, Quinn played professional basketball. Until about 2008, when their house was foreclosed upon, he hoped to resume that career. He was unemployed from 1999 until 2001, when Kimberley began supporting them by working part time at the Chanel cosmetic counter. Quinn was first employed with 24 Hour Fitness from 2001

---

[2] However, there is no amount listed in her expenses for repayments on the loaned funds.

[3] The expenses listed in general categories here are further itemized in the exhibit.

through 2006, unemployed except for odd jobs for two years, and then re-employed with 24 Hour Fitness from 2008 until 2020 when he was furloughed during the COVID pandemic. His last position at 24 Hour Fitness was district manager. Quinn's IRS W-2 forms from 2017 to 2019 were admitted into evidence and show that in 2017 his gross pay was $135,240 and his reported W-2 wages were $124,760.40; in 2018 his gross pay was $128,575.18 and his reported W-2 wages were $117,191.10; and in 2019, his last full year at 24 Hour Fitness, his gross pay was $141,918.37 and his reported W-2 wages were $132,411.49. Quinn received unemployment benefits from 2020 to 2021. Since then, he has worked as a "life coach" on a self-employed basis and as a part-time subcontractor for Activate180 and has three clients from whom he earns an average of $3,300 per month ($39,600 annually).[4] He also relied on money from his parents.

During post-trial proceedings, Quinn challenged Kimberley's entitlement to spousal maintenance, denying that her disability causes her to be incapacitated so that she is unable to work. He stated that she lives an active lifestyle, drives the children to their activities, goes skiing, and participates in volunteering and charity events. Quinn also argued that a spousal maintenance award—unlike child support—could not be based on "deemed income" or "earning potential" due to his alleged intentional underemployment. Instead, Quinn contended that spousal maintenance should be based on his actual income, and "[i]f it's $3,200 [per month], then the award would be $640 a month."[5]

Kimberley's mother, Kathy Kunzi told the jury that her daughter is disabled due to lymphedema, which she described "as if someone put a blood pressure cuff on . . . and

---

[4] Quinn testified that his coaching sessions are an hour long and that two clients pay him $200 per hour but one client through Activate 180 pays him $100 per hour.

[5] This $3,200 amount is slightly less than the $3,300 that Quinn said he earns on average.

4

pumped it up so hard that you just couldn't stand it anymore. That's what she lives with 24/7 on that leg." Without proper care, Kimberley's condition could cause ulcers on her leg, sepsis, and death. Kimberley is unable to work, has caregiving responsibilities for the children, and no one "quite understands the fragility of her health." Still, Kimberley tries to participate in family activities. Although she was unable to engage in skiing due to her pain, she was able to go on a couple of ski runs with her family by wearing a men's boot that was two sizes larger than her size on her affected limb and foot and then elevating them afterward.

Kimberley and Quinn's eldest son testified during post-trial proceedings that his mother is disabled and that her condition affects her daily and causes "real pain." He explained that she retains about 35 pounds of fluid on her right leg and has started retaining about 10 pounds on her left leg; she has difficulty walking up some stairs and doing laundry; she has to use a lot of ice and salt baths; she has to lie on a bed with her legs elevated to "get the fluid off," and he has seen her cry "just rolling out of a couch." He noted that because she loves and supports her children, she will sometimes do too much. If she had been on her feet or doing things for them for eight hours, five days in a row, "it hurt her every single second to do it." When his mother might have "overdone it," she would be "debilitated" afterward, and if her leg did not "go septic," she would need three or four days of rest to recover.

Toward the end of the post-trial proceeding, the trial court discussed its calculation of the spousal-maintenance amount, explaining that it was not considering Quinn's actual gross income because of his intentional underemployment:

Court:   What I did impute is that Mr. Harwood has been intentionally underemployed based on the skill set in his prior work, and from that, you know, he's had this dream or this vision that he would have, you know, this great coaching career. . . . And I recognize he's working for the contract work, but it

5

brings in next to nothing compared to the amount of extra time that he has and what he could have been doing to meet the needs for his family.

. . . .

Mr. Harwood's position has been, "Why bother? I have never had to. Why should I now? And I don't have to do it," and I think he's intentionally underemployed. At one point he was capable of making an income, but it's time to go outside that field. If the health industry/fitness industry went in the tank because of COVID, then you take your skill set and you look somewhere else. You don't just apply to other entities of the same nature. But he's had over two years to do that but has chosen not to. And so that's—that's where this finding of intentional underemployment comes from. . . . And this vision of being—whether it's going to be an NBA superstar in the early years or it was going to be, "Now I'm going to set up my own business," it's caused financial hardship on the family.

. . . .

[J]ust to make the record very clear. I based it going forward on his ability, what I think is his ability to earn, a proven record, and it's time that he got some motivation to do that. And, yeah, he can't continue to decide to be underemployed to chase a dream when he has financial obligations to support his children and his wife.

. . . .

Quinn's counsel: So, for the record, the amount is based on not his actual gross income, but—

Court: As he sits here today, it is not his actual gross income from his coaching business.

Quinn's counsel: Okay. And so you're applying Chapter 154 to Chapter 8 to come up with this amount of maintenance?

Court: That's where the 120 came from, yes, ma'am.[6]

---

[6] This was a potential-earnings amount based on the trial court's determination that Quinn had the ability to earn $120,000 annually but for his intentional underemployment.

After trial, the court signed a divorce decree stating, in relevant part, that Kimberley is unable to earn sufficient income to provide for her minimum reasonable needs because of an incapacitating physical injury and ordering Quinn to pay spousal maintenance:

> The Court finds KIMBERLEY ANNE HARWOOD has the inability to earn sufficient income to provide for minimum reasonable needs because of an incapacitating physical disability [citation omitted]. Having reviewed the evidence regarding KIMBERLEY ANNE HARWOOD's minimum reasonable needs, the Court finds KIMBERLEY ANNE HARWOOD's disability income, earning potential and property received as a just and right division of the marital estate are insufficient to meet those minimum reasonable needs. IT IS, THEREFORE ORDERED that QUINN HAMILTON HARWOOD shall pay monthly spousal maintenance in the amount of $1,500.00 per month beginning March 1, 2023 and continuing on or before the 1st day of each month thereafter until and for so long as KIMBERLEY ANNE HARWOOD continues to satisfy the eligibility criteria provided by [Texas Family Code] § 8.051(2)(A) or subsequent order of the Court.

Quinn filed a motion for new trial that was denied by operation of law and requested findings of fact and conclusions of law. The trial court made its findings and conclusions, including express findings as to Kimberley's incapacitating disability, her qualification for ongoing spousal maintenance, and her minimum reasonable needs.

On appeal, Quinn contends that the trial court abused its discretion by awarding spousal maintenance because Kimberley did not prove that her lymphedema is an incapacitating disability or that it prevented her from finding employment, and that the award was made without proof of her minimum reasonable needs and for an indefinite duration rather than for the minimum time required to obtain appropriate employment. Lastly, Quinn contends that the trial court abused its discretion by awarding spousal maintenance based on its finding that he is intentionally underemployed and could make $120,000 annually, rather than considering his

7

actual gross income at the time of trial, and by failing to determine that he had the ability to pay the spousal-maintenance ordered.

**DISCUSSION**

**Standard of review**

We review a trial court's decision to award spousal maintenance under an abuse-of-discretion standard. *Mehta v. Mehta*, No. 23-0507, 2025 WL 1733267, at *3 (Tex. 2025). A trial court abuses its discretion if it acts arbitrarily or unreasonably or fails to analyze or apply the law correctly. *Id.* While insufficiency of evidence is not an independent ground for challenging a spousal-maintenance award, an award that is not supported by legally sufficient evidence may constitute an abuse of discretion. *Id.* (citing *In re J.Y.O.*, 709 S.W.3d 485, 497 n.92 (Tex. 2024) (noting that legal and factual insufficiency are relevant factors in assessing whether trial court abused its discretion); *Henry v. Cox*, 520 S.W.3d 28, 34 (Tex. 2017) ("No abuse of discretion exists if some evidence reasonably supports the court's ruling.")).

"Evidence is legally sufficient if there is 'more than a mere scintilla' to support a vital fact-finding, i.e., 'the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Mehta*, 2025 WL 1733267, at *3 (quoting *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018)). "Reviewing courts must consider evidence in the light most favorable to the judgment and its findings, 'indulg[ing] every reasonable inference that would support it.'" *Id.* (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)).

## I. Spousal-maintenance eligibility

The Family Code authorizes spousal-maintenance awards under enumerated circumstances. *Id.* A spouse's eligibility for spousal maintenance is determined under section

8

8.051 of the Family Code, which provides in relevant part that a spouse is eligible to seek spousal maintenance upon divorce if the spouse lacks sufficient property to meet minimum reasonable needs and cannot support himself or herself because of (1) an incapacitating physical or mental disability, (2) the lack of adequate earning ability in a marriage lasting ten years or longer, or (3) a child in the home with a disability requiring substantial care and supervision:

> [T]he court may order maintenance for either spouse only if the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs and:
>
> . . . .
>
> (2) the spouse seeking maintenance:
>
> (A) is unable to earn sufficient income to provide for the spouse's minimum reasonable needs because of an incapacitating physical or mental disability;
>
> (B) has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs; or
>
> (C) is the custodian of a child of the marriage of any age who requires substantial care and personal supervision because of a physical or mental disability that prevents the spouse from earning sufficient income to provide for the spouse's minimum reasonable needs.

Tex. Fam. Code § 8.051.

There is a rebuttable presumption that spousal maintenance is not warranted under subsection 8.051(2)(B)—authorizing maintenance due to inadequate earning ability in a marriage lasting ten or more years—unless the spouse has been diligent in earning sufficient income to provide for the spouse's minimum reasonable needs, or in developing the necessary skills to provide for the spouse's minimum reasonable needs during a period of separation and while the

divorce suit is pending. *Id.* § 8.053. But that presumption is limited to spousal maintenance sought under subsection 8.051(2)(B). *See id.* It is inapplicable to a spouse who is eligible for maintenance under subsection 8.051(2)(A), based on their inability "to earn sufficient income to provide for their minimum reasonable needs because of their incapacitating physical or mental disability." *See Mehta*, 2025 WL 1733267, at *4; *see also* Tex. Fam Code § 8.053(a). Moreover, if the spouse seeking maintenance is unable to support himself or herself through appropriate employment because of an incapacitating physical or mental disability, the trial court may order spousal maintenance for an indefinite period of time, as long as the disability continues. *See* Tex. Fam. Code § 8.054(b) ("The court may order maintenance for a spouse to whom Section 8.051(2)(A) or (C) applies for as long as the spouse continues to satisfy the eligibility criteria prescribed by the applicable provision.").

After determining that a spouse is eligible for maintenance under section 8.051, a trial court applies the factors in section 8.052 to determine the "nature, amount, duration, and manner of periodic payments." *Mehta*, 2025 WL 1733267, at *4 (citing Tex. Fam. Code § 8.052). "Minimum reasonable needs" is undefined in the Family Code. *Id.* Trial courts generally have discretion to determine those needs on a case-by-case, fact-specific basis. *Id.* An itemized list of monthly income and expenses is the most "helpful" evidence to establish eligibility, but neither the Family Code nor Texas cases require exactitude. *Id.* In determining whether a spouse seeking spousal maintenance would lack sufficient property to provide for her minimum reasonable needs, a trial court may factor in all the spouse's available assets, including child support, on the income side of the ledger so long as it also considers child-related expenses the spouse will incur, if any, on the expense side of the ledger. *Id.* at *6.

The trial court made express findings as to Kimberley's incapacitating disability, her qualification for ongoing spousal maintenance, and her minimum reasonable needs:

- The Court finds Kimberley Anne Harwood has the inability to earn sufficient income to provide for her reasonable minimum needs because of an incapacitating physical disability, to wit: lymphedema.

- Having considered the testimony and evidence presented, Texas Family Code §8.051 (2)(A), the minimum reasonable needs of Kimberley Anne Harwood currently and in the future, Kimberley Anne Harwood's earning potential currently and in the future, the de minimis marital estate, both separate and community in nature, and the family's historical reliance on extended family to provide financial support throughout the marriage for both her medical care and family sustenance, the Court finds Kimberley Anne Harwood qualifies for ongoing Spousal Maintenance.

- In determining Kimberley Anne Harwood's minimum reasonable needs the Court considers her disability income, the child support ordered, the allocation of the marital estate which consisted of monies from the remaining proceeds of the marital estate in the amount of $57,835.60, certain personal property items out of the marital home of negligible value and four bank accounts with insufficient funds to pay her current rent and utilities. Under the possession and access provisions, Kimberley Anne Harwood will have the physical possession of the children the majority of the time and historically provides for their clothing, school supplies, food and daily personal expenses. In considering her future needs, once Quinn Hamilton Harwood's child support obligation reduces, then terminates, Kimberley Anne Harwood will still be disabled and unable to adequately provide for her own living expenses.

The evidence presented to the trial court supports its findings. First, the evidence showed that Kimberley has lymphedema of her right leg, which retains 20 to 30 pounds of fluid and causes swelling; her lymphedema has resulted in hospitalization and infections; her lymphedema causes aches and pains that negatively impact her life and affect her daily, including her ability to walk up stairs; she must wear four compression stockings, take salt baths, and elevate her leg "as much as feasibly possible" to manage her condition; and if she overexerts herself by being on her feet for eight hours, five days in a row, "it hurt[s] her every single second

11

to do it," and she would be "debilitated" afterward, requiring three or four days of rest to recover. *See Pickens v. Pickens*, 62 S.W.3d 212, 215-16 (Tex. App.—Dallas 2001, pet. denied) (concluding that evidence on incapacity for spousal-maintenance award need not be limited to expert testimony; fact finder may reasonably infer incapacity from circumstantial evidence or competent testimony of lay witnesses). The undisputed evidence was that her lymphedema existed throughout the marriage. Her condition had deteriorated, with the swelling beginning to affect her left leg as well as her right leg.

Additionally, there was evidence that Kimberley had been employed at Chanel from 1999 and 2002—a period that includes years when Quinn was unemployed and she had to support their family—but for over 20 years since that time, she has not been employed. Kunzi testified that Kimberley is unable to work, pointed to Kimberley's caregiving responsibilities for the children, and said that no one "quite understands the fragility of her health." *See id.* at 216 (concluding wife's lay testimony was some probative evidence supporting trial court's finding of her incapacitating physical disability).

Further, Kimberley provided a budget to the trial court showing in detail her monthly income of $6,172 and expenses of $9,960.50. She itemized the income she receives as the parent caregiver of the children who will continue residing with her for the majority of the time under the possession-and-access provisions of the divorce decree. This income includes $1,972 in disability benefits, $1,200 in child support, and $3,000 in loaned funds from her parents. Kimberley also itemized the expenses for herself and the children, which we have summarized above. *See Mehta*, 2025 WL 1733267, at *6 (noting "in a situation where the spouse seeking maintenance also receives child support, both the child support and the children's expenses necessarily factor into the spousal-maintenance calculus"). When awarding spousal

12

maintenance, the trial court also considered the parties' remaining marital estate of $57,835.60, certain personal-property items of negligible value from their home, and four bank accounts with balances insufficient to pay Kimberley's current rent and utilities.

Having reviewed this record, we conclude that the trial court was presented with legally sufficient evidence to support the court's (1) determination that Kimberley's lymphedema is an incapacitating physical disability, (2) determination of Kimberley's minimum reasonable needs, and (3) determination that her lymphedema renders her unable to earn sufficient income to provide for her minimum reasonable needs. Based on the evidence presented and using the appropriate standards, we conclude that the trial court's determination that Kimberley is eligible for spousal maintenance rises to a level that would enable reasonable and fair-minded people to differ in their conclusions; thus, the eligibility decision did not constitute an abuse of the trial court's discretion. *See Mehta*, 2025 WL 1733267, at \*3. Moreover, because the trial court made express findings of Kimberley's eligibility for maintenance under subsection 8.051(2)(A), it did not err by ordering spousal-maintenance payments "for so long as [she] continues to satisfy the eligibility criteria provided by [Texas Family Code] § 8.051(2)(A) or subsequent order of the Court." *See Summerville v. Bright*, No. 05-19-00989-CV, 2020 WL 3566721, at \*3 & n.1 (Tex. App.—Dallas July 1, 2020, no pet.) (mem. op.) (concluding that decree's lack of end date for spousal maintenance payments was not error because trial court made express findings of wife's eligibility for maintenance under subsection 8.051(2)(A), also noting that spousal-maintenance order is subject to modification on court's or party's motion). We overrule Quinn's first issue.

## II. Spousal-maintenance calculation

Next, Quinn contends that the trial court abused its discretion by ordering him to pay spousal maintenance of $1,500 monthly to Kimberley based on a finding of his alleged intentional underemployment and deemed income rather than his actual income. We agree.

Section 8.055 of the Family Code caps the amount of spousal maintenance at the lesser of (1) $5,000; or (2) 20 percent of the spouse's average monthly gross income. Tex. Fam. Code § 8.055(a). The statute defines "gross income" as including (1) 100% of all wage and salary income and other compensation for personal services; (2) interest, dividends, and royalty income; (3) self-employment income; (4) net rental income; and (5) all other income actually being received, including severance pay, retirement benefits, pensions, trust income, annuities, capital gains, unemployment benefits, interest income from notes regardless of the source, gifts and prizes, maintenance, and alimony. *Id.* § 8.055(a-1)(1). Gross income does not include (1) return of principal or capital; (2) accounts receivable; (3) benefits paid in accordance with federal public assistance programs; (4) benefits paid in accordance with the Temporary Assistance for Needy Families program; (5) payments for foster care of a child; (6) Department of Veterans Affairs service-connected disability compensation; (7) supplemental security income (SSI), social security benefits, and disability benefits; or (8) workers' compensation benefits. *Id.* § 8.055(a-1)(2).

At the time of trial, Quinn testified that he was earning an average of $3,300 per month. Twenty percent of $3,300 is $660, which would be the maximum amount allowed by statute. *Id.* § 8.055(a)(2). The trial court ordered spousal maintenance of $1,500. Although neither the decree nor the findings specify the basis for this amount, the trial court explained during the post-trial proceeding that he found Quinn was intentionally underemployed, that the

14

amount of spousal maintenance ordered was not based on Quinn's actual gross income from his coaching business, and that the court was applying Chapter 154 to Chapter 8 to come up with the maintenance amount, which was based on deemed earnings of $120,000 per year.

In a similar case, the Thirteenth Court of Appeals reversed a trial court's award of excessive spousal maintenance and rejected the contention that the trial court could rely on the "earning potential" of an obligor spouse who is "intentionally underemployed." *In re Marriage of Contreras*, No. 13-21-00063-CV, 2022 WL 17983483, at *12 (Tex. App.—Corpus Christi–Edinburg Dec. 29, 2022, no pet.) (mem. op.). The Thirteenth Court concluded that, as to the child-support obligation, the evidence was sufficient for the trial court to impliedly find that the obligor was intentionally underemployed and to impliedly base the child-support obligation on the obligor's earning potential rather than his actual income. *See id.* (citing Tex. Fam. Code § 154.066(a) ("If the actual income of the obligor is significantly less than what the obligor could earn because of intentional unemployment or underemployment, the court may apply the support guidelines to the earning potential of the obligor.")). But it distinguished the spousal-maintenance award, which is governed by another chapter of the Family Code, stating that section "8.055 includes no equivalent provision authorizing the trial court to assess spousal maintenance based on earning potential rather than actual income due to intentional underemployment." *Id.* (citing Tex. Fam. Code § 8.055).

Here, the trial court's $1,500 spousal-maintenance award relied on a finding of intentional underemployment, not authorized by section 8.055 of the Family Code, to deem income of $120,000 annually to Quinn rather than basing the award on his actual gross income. There is no evidence that Quinn's average monthly gross income of $3,300 supports a spousal-maintenance award of $1,500, and that amount, which exceeds 20% of Quinn's average

15

monthly gross income under section 8.055, constitutes an abuse of the trial court's discretion. *See* Tex. Fam. Code § 8.055(a); *Mehta*, 2025 WL 1733267, at *3; *see also In re Marriage of Contreras*, 2022 WL 17983483, at *12 ("the amount of maintenance awarded by the trial court is discretionary only within the statutory limits"). We sustain Quinn's second issue.[7]

## CONCLUSION

We affirm the trial court's determination that Kimberly is eligible for spousal maintenance but reverse the spousal-maintenance amount awarded in the trial court's final divorce decree and remand this case for a new trial on that issue.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Theofanis and Ellis

Affirmed in Part, Reversed and Remanded in Part

Filed:   August 6, 2025

_____

[7] Because we have sustained this issue, we need not reach Quinn's contention that the district court abused its discretion by failing to determine that he had the ability to pay the spousal maintenance ordered.

16